# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| RICHARD E. KOEHLER, Derivatively on Behalf of Nominal Defendant DANAHER CORPORATION,<br><br>1804 Wright Drive,<br>Port Orange, Florida 32128<br><br>Plaintiff,<br><br>v.<br><br>RAINER M. BLAIR<br>c/o Danaher Corporation<br>2200 Pennsylvania Avenue, N.W., Suite 800W<br>Washington, D.C. 20037<br><br>MATT MCGREW<br>c/o Danaher Corporation<br>2200 Pennsylvania Avenue, N.W., Suite 800W<br>Washington, D.C. 20037<br><br>EMMANUEL LIGNER<br>c/o Danaher Corporation<br>2200 Pennsylvania Avenue, N.W., Suite 800W<br>Washington, D.C. 20037<br><br>FEROZ DEWAN<br>c/o Danaher Corporation<br>2200 Pennsylvania Avenue, N.W., Suite 800W<br>Washington, D.C. 20037<br><br>LINDA HEFNER FILLER<br>c/o Danaher Corporation<br>2200 Pennsylvania Avenue, N.W., Suite 800W<br>Washington, D.C. 20037<br><br>TERI LIST<br>c/o Danaher Corporation<br>2200 Pennsylvania Avenue, N.W., Suite 800W<br>Washington, D.C. 20037 | Case No. _______________<br><br>JURY TRIAL DEMANDED |

WALTER G. LOHR, JR.
c/o Danaher Corporation
2200 Pennsylvania Avenue, N.W., Suite 800W
Washington, D.C. 20037

JESSICA L. MEGA
c/o Danaher Corporation
2200 Pennsylvania Avenue, N.W., Suite 800W
Washington, D.C. 20037

MITCHELL P. RALES
c/o Danaher Corporation
2200 Pennsylvania Avenue, N.W., Suite 800W
Washington, D.C. 20037

STEVEN M. RALES
c/o Danaher Corporation
2200 Pennsylvania Avenue, N.W., Suite 800W
Washington, D.C. 20037

PARDIS C. SABETI
c/o Danaher Corporation
2200 Pennsylvania Avenue, N.W., Suite 800W
Washington, D.C. 20037

A. SHANE SANDERS
c/o Danaher Corporation
2200 Pennsylvania Avenue, N.W., Suite 800W
Washington, D.C. 20037

JOHN T. SCHWIETERS
c/o Danaher Corporation
2200 Pennsylvania Avenue, N.W., Suite 800W
Washington, D.C. 20037

ALAN G. SPOON
c/o Danaher Corporation
2200 Pennsylvania Avenue, N.W., Suite 800W
Washington, D.C. 20037

RAYMOND C. STEVENS
c/o Danaher Corporation
2200 Pennsylvania Avenue, N.W., Suite 800W
Washington, D.C. 20037

ELIAS A. ZERHOUNI
c/o Danaher Corporation
2200 Pennsylvania Avenue, N.W., Suite 800W
Washington, D.C. 20037

JOAKIM WEIDEMANIS
c/o Danaher Corporation
2200 Pennsylvania Avenue, N.W., Suite 800W
Washington, D.C. 20037

DANIEL A. RASKAS
c/o Danaher Corporation
2200 Pennsylvania Avenue, N.W., Suite 800W
Washington, D.C. 20037

and

JENNIFER L. HONEYCUTT
c/o Danaher Corporation
2200 Pennsylvania Avenue, N.W., Suite 800W
Washington, D.C. 20037

Defendants,

and

DANAHER CORPORATION,

2200 Pennsylvania Avenue, N.W., Suite 800W
Washington, D.C. 20037

Nominal Defendant.

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Richard E. Koehler ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of Nominal Defendant Danaher Corporation ("Danaher" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff

alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things: (i) a review of documents produced to Plaintiff by Danaher in response to a books and records inspection demand made pursuant to 8 *Del. C.* § 220 ("Section 220" and the "Section 220 Demand");[1] (ii) Defendants' publicly available documents, conference call transcripts and announcements made by Defendants; (iii) United States Securities and Exchange Commission ("SEC") filings; (iv) press releases published by and regarding Danaher; (v) legal filings; (vi) news reports; (vii) securities analysts' reports about the Company; (viii) filings in the related securities class action captioned *Hawkins v. Danaher Corp.*, Case No. 1:23-cv-02055-AHA (D.D.C.) (the "Securities Class Action"); and (ix) other publicly available information.

## **NATURE OF THE ACTION**

1. This is a shareholder derivative action brought on behalf of Danaher against certain current and former officers and members of the Company's Board (collectively, the "Individual Defendants")[2] for, *inter alia,* breaches of their fiduciary duties between at least January 27, 2022, and October 23, 2023, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

---

[1] References herein to documents stamped "DHR220_0000000###" are to documents produced in response to the Section 220 Demand.

[2] Individual Defendants are Rainer M. Blair ("Blair"), Matt McGrew ("McGrew"), Emmanuel Ligner ("Ligner"), Feroz Dewan ("Dewan"), Linda Hefner Filler ("Filler"), Teri List ("List"), Walter G. Lohr, Jr. ("Lohr"), Jessica L. Mega ("Mega"), Mitchell P. Rales ("Mitchell Rales"), Steven M. Rales ("Steven Rales"), Pardis C. Sabeti ("Sabeti"), A. Shane Sanders ("Sanders"), John T. Schwieters ("Schwieters"), Alan G. Spoon ("Spoon"), Raymond C. Stevens ("Stevens"), Elias A. Zerhouni ("Zerhouni"), Joakim Weidemanis ("Weidemanis"), Daniel A. Raskas ("Raskas"), and Jennifer L. Honeycutt ("Honeycutt"). The Individual Defendants, together with Danaher, are "Defendants."

2. Danaher is a global science and technology conglomerate comprised of more than twenty operating companies. The Company is organized into four segments: (i) Biotechnology,[3] (ii) Life Sciences, (iii) Diagnostics, (iv) and Environmental & Applied Solutions ("EAS").

3. Following the onset of the COVID-19 pandemic in 2020, Danaher experienced extraordinary growth driven largely by demand for its diagnostics and bioprocessing products and Danaher's diagnostic tests and life sciences equipment were widely used in the effort to combat the disease. Those results were fueled by pandemic-specific conditions that were expected to abate as COVID-19 transitioned to an endemic disease. Despite this knowledge, and despite purportedly maintaining systems designed to monitor customer demand, inventory levels, and funding conditions, the Individual Defendants repeatedly assured the market that Danaher's pandemic-era growth trajectory was sustainable. As a result, Danaher experienced explosive revenue growth during this period, and its stock price nearly tripled, reaching an all-time high of $332.43 per share on September 3, 2021.

4. In denying in part the motion to dismiss in the Securities Class Action, the Court acknowledged that the bioprocessing division was central to Danaher's operations. In particular, the Court pointed to the allegations that "on every single call hosted by Danaher" analysts asked about bioprocessing.[4] Thus, senior management and the Board were aware of how COVID-19's endemic phase adversely impacted bioprocessing.

5. However, by the beginning of 2022, it became clear that the COVID-19 virus was

[3] Prior to 2022, Danaher reported the results of Biotechnology group under the Life Sciences group. However, by September 15, 2022, the Company separated its Cytiva and Pall businesses from the Life Sciences group to create the Biotechnology group.

[4] Memorandum Opinion and Order at 11, *Hawkins, et al. v. Danaher Corp., et al.*, Case No. 1:23-cv-02055 (D.D.C. Aug. 4, 2025) (Dkt. No. 37) (the "Order").

entering an endemic phase, generally meaning that the numbers of infections were no longer growing exponentially and health care systems were not overwhelmed, necessitating a shift in response. Similarly, that also meant that demand for Danaher's products, which propelled the Company to new heights during the COVID-19 pandemic, would begin to dissipate.

6. Despite publicly and repeatedly declaring that there would be enduring demand for the Company's products supporting the development of treatments for COVID-19, and that the bioprocessing business' far larger non-COVID product offerings provided a robust runway for long-term growth, Danaher was in jeopardy of falling short of its COVID-19 pandemic-era success. Indeed, the Individual Defendants issued materially misleading statements portraying Danaher's growth as durable and resilient while downplaying the significance of customer destocking, declining order volumes, and weakening demand unrelated to COVID-19. Large pharmaceutical customers, who had stockpiled inventory during the peak of the pandemic and now benefitted from increased clarity in their supply chains, found a reduced need to place new orders with the Company as they continued to work through their existing inventory. Additionally, smaller startups in early-stage development, which traditionally relied on external sources, no longer had the same access to funding that they did during the pandemic, and began to cut spending.

7. Throughout the Relevant Period, the Company and its top executives repeatedly dismissed such concerns of reduced purchases, ignoring ongoing customer activity and market conditions which posed a significant threat to the continued growth of Danaher's business in 2022 and 2023.

8. Following several partial and inadequate disclosures throughout the Relevant Period, on October 24, 2023, the Company finally revealed that it had cut its full year financial

outlook yet again, increasing the core sales decline to a firm low, double-digit range, and inverting modest growth in the base business to a low single-digit decline. On this news, Danaher's stock price dropped $11.40, nearly 5.6%, over the following two days, to close at $192.65 on October 25, 2023.

9. Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct materially false and/or misleading statements and omissions of material facts to the investing public concerning the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) revenues from the Company's COVID-19 related products would materially decline as customers pursued other priorities as the COVID-19 pandemic ended and the COVID-19 virus entered its endemic phase; (ii) customers had stockpiled inventory in the aftermath of the COVID-19 pandemic and were relying on those items to satisfy their needs instead of placing new orders with the Company; (iii) smaller, early-stage biotechnology customers no longer had the same access to external funding to purchase the Company's products; (iv) revenues from the Company's products and services unassociated with COVID-19 were insufficient to compensate for the foregoing downturn in business; (v) accordingly, Danaher would be unable to sustain its pandemic-era growth in 2022 and 2023; (vi) the Company failed to maintain adequate internal controls; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

10. The Section 220 documents demonstrate that leading up to and throughout the Relevant Period, the Individual Defendants were aware of, and discussed, the declining revenues of the Company's COVID-related business, the Company's customer's stockpiled inventory, the

reduction in COVID funding, and the diminished revenue from the Company's non-COVID-related business.

11. [redacted]

12. [redacted]

13. [redacted]

14. [redacted]

[redacted]

15. [redacted]

16. [redacted]

17. [redacted]

[redacted]

18. [redacted]

19. [redacted]

20. [redacted]

21. [redacted]

22. While Danaher's stock traded at artificially inflated prices as a result of the misrepresentations described herein, the Insider Selling Defendants (defined below) sold more than $50 million of their personally held Danaher stock. The Court, in denying the defendants motion to dismiss in part in the Securities Class Action, stated defendant Matthew R. McGrew's ("McGrew") sales of stock were a "plausible profit motive for these misstatements." Order at 15. Indeed, while they were making misleading statements, defendants Blair and McGrew sold $7.5 million and $5.2 million of their personally held Danaher stock, respectively.

23. As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill. The parties to the Securities Class Action recently announced a settlement of that action requiring the defendants to pay an astounding $172.5 million to the aggrieved class. *See* Securities Class Action, Dkt. No 49. Prior to that, the Court denied the defendants' motion to dismiss, in part, finding that plaintiffs adequately alleged material misstatements made with scienter, including extreme recklessness. Order at 9-11, 14.

24. Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in

fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Danaher's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under sections 14(a), 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act").

26. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

27. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

28. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

29. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

30. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise

of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

31. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Danaher maintains its principal executive offices in this District, Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

***Plaintiff***

32. Plaintiff is, and has been at all relevant times, a continuous shareholder of Danaher. Specifically, Plaintiff has been a continuous hold of Danaher commons stock since September 2016.

***Nominal Defendant***

33. Nominal Defendant Danaher is incorporated under the laws of Delaware, with its principal executive offices located at 2200 Pennsylvania Avenue, N.W., Suite 800W, Washington, DC. Danaher's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DHR."

***Individual Defendants***

34. Defendant Blair has served as the Company's Chief Executive Officer ("CEO"), President, and as a member of the Board since September 2020. Defendant Blair also serves as a member of the Company's Science & Technology Committee, Executive Committee, and Finance

Committee. Defendant Blair is named as a defendant in the Securities Class Action. While in possession of material, nonpublic information concerning the Company's true business health, defendant Blair sold 25,000 shares of his personally held Danaher stock for $7.5 million in proceeds. According to the Company's public filings, Defendant Blair received the following total compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2022 | $20,196,027 |
| 2023 | $20,903,282 |

35. Defendant Dewan has served as a member of the Board since 2022. Defendant Dewan also serves as a member of the Company's Nominating & Governance Committee, Science & Technology Committee, and Finance Committee. According to the Company's public filings, Defendant Dewan received the following total compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2022 | $224,616 |
| 2023 | $318,133 |

36. Defendant Filler has served as a member of the Board since 2005. Defendant Filler also serves as Chair of the Company's Nominating & Governance Committee and as a member of the Science & Technology Committee. While in possession of material, nonpublic information concerning the Company's true business health, defendant Filler sold 10,190 shares of her personally held Danaher stock for over $2.6 million in proceeds. According to the Company's public filings, Defendant Filler received the following total compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2022 | $368,308 |
| 2023 | $382,133 |

37. Defendant List has served as a member of the Board since 2011. Defendant List also serves as a member of the Company's Audit Committee and Compensation Committee. While in possession of material, nonpublic information concerning the Company's true business health, defendant List sold 3,490 shares of her personally held Danaher stock for $918,917 in proceeds. According to the Company's public filings, Defendant List received the following total compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2022 | $308,308 |
| 2023 | $318,133 |

38. Defendant Lohr served as a member of the Board from 1983 until May 7, 2024. Defendant Lohr also served as a member of the Company's Compensation Committee, Nominating & Governance Committee, and Finance Committee. While in possession of material, nonpublic information concerning the Company's true business health, defendant Lohr sold 7,396 shares of his personally held Danaher stock for $1.9 million in proceeds. According to the Company's public filings, Defendant Lohr received the following total compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2022 | $322,308 |
| 2023 | $328,133 |

39. Defendant Mega has served as a member of the Board from 2019 to February 5, 2026. Defendant Mega also served as a member of the Company's Compensation Committee and Science & Technology Committee. According to the Company's public filings, Defendant Mega received the following total compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2022 | $308,308 |

| | |
|---|---|
| 2023 | $318,133 |

40. Defendant Mitchell Rales is a co-founder of the Company and has served as a member of the Board since 1983. Defendant Mitchell Rales also serves as Chair of the Company's Finance Committee and Chair of the Executive Committee. According to the Company's public filings, Defendant Mitchell Rales received the following salary from the Company during the Relevant Period:

| **Year** | **Total Compensation** |
|---|---|
| 2022 | $419,000 |
| 2023 | $419,000 |

41. Defendant Steven Rales is a co-founder of the Company and has served as a member of the Board since 1983 and as Chairman of the Board since 1984. Steven Rales previously serves as Danaher's CEO 1984 to 1990. Defendant Steven Rales also serves as a member of the Company's Science & Technology Committee, Executive Committee, and Finance Committee. According to the Company's public filings, Defendant Steven Rales received the following salary from the Company during the Relevant Period:

| **Year** | **Total Compensation** |
|---|---|
| 2022 | $419,000 |
| 2023 | $419,000 |

42. Defendant Sabeti served as a member of the Board from 2019 to December 2024. Defendant Sabeti also served as a member of the Company's Science & Technology Committee. According to the Company's public filings, Defendant Sabeti received the following total compensation from the Company during the Relevant Period:

| **Year** | **Total Compensation** |
|---|---|
| 2022 | $308,308 |
| 2023 | $318,133 |

43. Defendant Sanders has served as a member of the Board since 2021. Defendant

Sanders also serves as a member of the Company's Audit Committee and Nominating & Governance Committee. According to the Company's public filings, Defendant Sanders received the following total compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2022 | $308,308 |
| 2023 | $320,133 |

44. Defendant Schwieters has served as a member of the Board since 2003. Defendant Schwieters also serves as Chair of the Company's Audit Committee and as a member of the Nominating & Governance Committee. According to the Company's public filings, Defendant Schwieters received the following total compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2022 | $333,308 |
| 2023 | $351,133 |

45. Defendant Spoon has served as a member of the Board since 1999. Defendant Spoon also serves as Chair of the Company's Compensation Committee. According to the Company's public filings, Defendant Spoon received the following total compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2022 | $328,308 |
| 2023 | $338,133 |

46. Defendant Stevens has served as a member of the Board since 2017. Defendant Stevens also serves as a member of the Company's Audit Committee and Science & Technology Committee. hile in possession of material, nonpublic information concerning the Company's true business health, defendant Stevens sold 8,410 shares of his personally held Danaher stock for $2.2 million in proceeds. According to the Company's public filings, Defendant Stevens received the

following total compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2022 | $308,308 |
| 2023 | $318,133 |

47. Defendant Zerhouni has served as a member of the Board since 2017. Defendant Zerhouni also serves as Chair of the Company's Science & Technology Committee and as a member of the Nominating & Governance Committee. According to the Company's public filings, Defendant Zerhouni received the following total compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2022 | $328,308 |
| 2023 | $338,133 |

48. Defendant McGrew has been Danaher's Executive Vice President since January 2019. He was also Danaher's CFO from January 2019 to February 2026; Danaher Group CFO, Diagnostics and Dental from May 2012 to January 2019; Vice President-Investor Relations from at least June 2009 to May 2014; and held various positions of increasing responsibility from 2004 to at least June 2009. Defendant McGrew is named as a defendant in the Securities Class Action. While in possession of material, nonpublic information concerning the Company's true business health, defendant McGrew sold 18,935 shares of his personally held Danaher stock for $5.2 million in proceeds. . According to the Company's public filings, Defendant McGrew received the following total compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2022 | $7,183,344 |
| 2023 | $7,496,078 |

49. Defendant Ligner served as Vice President and Group Executive of the Biotechnology reporting segment since it was established in September 2022, and as President and

CEO of Cytiva since it was acquired by Danaher in March 2020, until stepping down from his roles at the Company in October 2023. Defendant Ligner is named as a defendant in the Securities Class Action.

50. Joakim Weidemanis was Danaher's Executive Vice President from December 2017 to June 2024; Vice President—Group Executive from March 2014 to December 2017; and Group President—Marking and Coding from January 2013 to March 2014. While in possession of material, nonpublic information concerning the Company's true business health, defendant Weidemanis sold 80,889 shares of his personally held Danaher stock for $21.6 million in proceeds. In 2022 and 2023, Danaher paid defendant Weidemanis more than $8.2 and $8.4 million, respectively.

51. Daniel A. Raskas was Danaher's Senior Vice President—Corporate Development from February 2010 to at least March 2025, and also Vice President—Corporate Development from November 2004 to February 2010. While in possession of material, nonpublic information concerning the Company's true business health, defendant Raskas sold 31,060 shares of his personally held Danaher stock for over $7.4 million in proceeds.

52. Jennifer L. Honeycutt was Danaher's Executive Vice President from January 2021 to September 2023; Vice President—Group Executive from May 2019 to January 2021; and President, Pall Business from January 2017 to May 2019. While in possession of material, nonpublic information concerning the Company's true business health, defendant Honeycutt sold 11,988 shares of her personally held Danaher stock for $3.2 million in proceeds. In 2022, Danaher paid defendant Honeycutt more than $5.8 million.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

53. By reason of their positions as officers and/or directors of Danaher, and because of their ability to control the business and corporate affairs of Danaher, the Individual Defendants owed Danaher and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Danaher in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Danaher and its shareholders so as to benefit all shareholders equally.

54. Each director and officer of the Company owes to Danaher and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

55. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Danaher, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

56. To discharge their duties, the officers and directors of Danaher were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

57. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Danaher, the absence of good faith on

their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

58. As senior executive officer and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

59. To discharge their duties, the officers and directors of Danaher were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Danaher were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, the District of Columbia, and the United States, and pursuant to Danaher's own Code of Conduct;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Danaher conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Danaher and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Danaher's operations would comply with all applicable laws and Danaher's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

60. Each of the Individual Defendants further owed to Danaher and the shareholders the duty of loyalty requiring that each favor Danaher's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position,

influence, or knowledge of the affairs of the Company to gain personal advantage.

61. At all times relevant hereto, the Individual Defendants were the agents of each other and of Danaher and were at all times acting within the course and scope of such agency.

62. Because of their advisory, executive, managerial, and directorial positions with Danaher, each of the Individual Defendants had access to adverse, non-public information about the Company.

63. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Danaher.

**DANAHER'S CODES OF CONDUCT**

64. Danaher maintains a Code of Conduct providing the Company's "commitment to operating with the highest ethical standards" In a letter from the Company's CEO Defendant Blair introducing the Code of Conduct, the Code of Conduct states that:

> Our Code of Conduct sets forth the standards by which we conduct our operations. It covers a range of topics, from the use of corporate resources, to gifts and conflicts of interest, to data privacy. It addresses cybersecurity and conveys our view of an inclusive workplace that is free of harassment and welcoming to all associates. It applies to all associates and sets a clear expectation that our standards must be followed in all job-related activities, regardless of business pressures.

65. Under a section titled "Who Must Follow Our Code?" the Code of Conduct states, in relevant part, that "[o]ur Code applies to all Danaher associates and, when they are acting on behalf of Danaher, all directors of Danaher Corporation or any of its direct or indirect subsidiaries."

66. Under a section titled "Your Responsibilities," the Code of Conduct states, in relevant part:

> You have a responsibility to yourself, your fellow associates and the Company to conduct business legally and ethically.

> Make sure you understand our Code and policies, and pay attention to the policies that apply to your job responsibilities. If you are unclear about your responsibilities, or what the right thing to do is, talk to your manager or access any of the other resources listed in our Code, including Speak Up! and the other resources listed in the Danaher Escalation Policy.
>
> Do your best to prevent violations of our Code and policies before they occur, and if you suspect that there has been a violation, let someone know. Ignoring problems only makes these violations worse.

67. Under a section titled "Additional Responsibilities of Danaher Leaders," the Code of Conduct states, in relevant part:

> If you are a leader or manager, you have additional responsibilities to help us meet our high standards of ethics and compliance:
>
> - Lead by example and be a role model for ethical behavior.
> - Be a resource for others. Communicate to associates and business partners about how the Code and policies apply to their daily work, and help them to understand the importance of a strong ethics and compliance culture.
> - Create an environment where associates understand their responsibilities and feel comfortable raising concerns without fear of retaliation.
> - Consider ethics and compliance when hiring, evaluating and rewarding associates.

68. Under a section titled "Reporting and Asking Questions," the Code of Conduct states, in relevant part, that "[e]veryone must do their part if we are to maintain our high standards for ethics and integrity. If you believe that a violation of law, our Code or policies has occurred, Speak Up! You do not need to be certain of all the facts."

69. Under a section titled "Accountability and Discipline," the Code of Conduct states, in relevant part, that "[w]hen a violation of the Code, policies or the law occurs, appropriate disciplinary action will be taken, up to and including termination of employment consistent with applicable laws. Certain actions may also result in legal proceedings, penalties or criminal prosecution."

70. Under a section titled "Conflicts of Interest," the Code of Conduct states, in relevant

part:

> A "conflict of interest" occurs when an associate's private interest interferes in any way or even appears to interfere with the interests of Danaher.
>
> The existence of a real or potential conflict of interest is not necessarily a violation of our Code. However, continuing to work for Danaher in any role, or participating in any decision, that involves that conflict of interest without disclosing it is a violation.
>
> For questions and disclosures regarding conflicts of interest, please contact the Legal Department.

71. Under a section titled "Recordkeeping and Financial Reporting," the Code of Conduct states, in relevant part:

> Investors, government officials and others rely on our accurate and honest books and records. Accurate information is also essential within the Company so that we can make informed business decisions.
>
> Associates with finance or accounting jobs or, jobs that affect product quality, have a special responsibility in this area, but all of us contribute to the process of recording business results and maintaining records. Each of us has a responsibility to ensure that the information we submit in all Danaher records is complete, accurate and understandable.
>
> To ensure that we can meet our responsibility to cooperate with audits, investigations and legal document requests, we must preserve records according to our policies, respond fully with all information requested and refrain from editing, modifying or deleting requested information.
>
> - Make sure that all Company records including financial entries, expense reports and time sheets are clear and complete and do not hide the true nature of any transaction.
> - Never record false sales or shipments, nor record them early, understate or overstate known liabilities and assets, or defer recording items that should be expensed.
> - Make sure that all engineering, quality and production records are accurate. Never falsify such records or make them misleading in any way.
> - Do not establish any unrecorded Company funds or assets, such as "slush funds" or any other types of "off the books" accounts.
> - Associates with any role in the preparation of Danaher Corporation's financial statements and disclosures have a responsibility to ensure that they are complete and do not contain any false or misleading statements.

- Never pressure, manipulate or mislead outside accountants involved in auditing or reviewing our financial statements or internal controls.

72. Under a section titled "Use of Company Assets," the Code of Conduct states, in relevant part:

> Each of us is entrusted with the care of Company assets. We must protect them from loss, damage, theft, waste and improper use. Any digital communication using company assets or company managed tools may not be confidential.
>
> Danaher assets include physical property, facilities, equipment, vehicles, inventory and supplies, as well as corporate opportunities, financial resources, intellectual property, confidential information, files, documents, information systems and data.

73. Under a section titled "External Communications," the Code of Conduct states, in relevant apart:

> Danaher strives to provide clear and accurate information to the media, financial analysts and the public. In addition to satisfying important legal requirements, this helps us maintain the trust of our shareholders, potential investors and government regulatory bodies. This, in turn, strengthens our corporate reputation. For these reasons, it is important that only designated associates speak publicly on behalf of Danaher.

74. Under a section titled "Ethics and Compliance at Danaher," the Code of Conduct states, in relevant part:

> The Danaher Code of Conduct is endorsed by, and has the full support of the Danaher Board of Directors. The Danaher Board of Directors is responsible for overseeing ethics and compliance at Danaher.
>
> The Ethics and Compliance team, among other responsibilities, applies and interprets the Code, manages the intake and investigation of Speak Up! questions and concerns, develops and disseminates ethics and compliance trainings and communications, and assists with the design and implementation of preventative compliance measures.
>
> The Danaher Ethics and Compliance team is managed by the Chief Ethics and Compliance Officer who reports directly to the Danaher Corporation General Counsel. The General Counsel has direct access and reporting obligations to the Board of Directors and appropriate Board committee. In administering the Code, the Ethics and Compliance team works closely with other Corporate, Platform and

> Operating Company functions including Legal, Human Resources, Internal Audit, Finance and other groups focused on ensuring and monitoring compliance.

## DANAHER'S AUDIT COMMITTEE CHARTER

75. Danaher's Audit Committee Charter states that the purpose of the Audit Committee is to, among other things, "assist the Board in overseeing (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements . . . ."

76. With respect to the Audit Committee's responsibilities concerning Financial Statements, Disclosure Matters and Controls & Procedures, the Audit Committee Charter states that that the Audit Committee shall, among other things:

> 1. Prior to the filing of the Annual Report on Form 10-K, meet to review and discuss with management and the independent auditor the Company's annual audited financial statements (including reviewing the Company's specific disclosures made in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A")), the results of the independent auditor's annual audit and the report thereon and any other matter required by applicable PCAOB standards, NYSE listing standards or the Exchange Act (including the rules promulgated thereunder); and recommend to the Board whether the audited financial statements should be included in the Form 10-K.
> 2. Prior to the filing of the Quarterly Report on Form 10-Q, meet to review and discuss with management and the independent auditor the Company's quarterly financial statements (including reviewing the Company's specific disclosures made in the MD&A) and the results of the independent auditor's review of the quarterly financial statements.
> 3. Prior to the filing of the Annual Report on Form 11-K relating to the Company's savings plans, review and discuss with management and the independent auditor the annual audited financial statements of the Company's savings plans.
> 4. Review and discuss with management and the independent auditor:
>     (a) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies;
>     (b) analyses prepared by management and/or the independent auditor

setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effect of alternative GAAP methods on the financial statements;

(c) the effect of off-balance sheet structures on the Company's financial statements; and

(d) the effect of regulatory and accounting initiatives on the Company's financial statements.

5. Review and discuss with the independent auditor:

(a) the reports and other communications of the independent auditor required by law or professional auditing standards regarding (1) all critical accounting policies and practices to be used by the Company, (2) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor, and (3) other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences;

(b) critical accounting matters to be included in the independent auditor's report;

(c) the matters required to be discussed by Statement on Auditing Standards No. 114 relating to the conduct of the audit, including without limitation, any difficulties encountered in the course of the work, any restriction on the scope of the independent registered public accounting firm's activities or on access to requested information and any significant disagreements with management;

(d) management's annual report on, and the independent auditor's evaluation of the effectiveness of, the Company's internal control over financial reporting; and

(e) assurances from the independent auditor that Section 10A(b) of the Exchange Act, regarding the reporting of illegal acts, has not been implicated.

6. Review and discuss with management:

(a) the process for the CEO and CFO quarterly certifications required by the Commission and the disclosures made by the CEO and/or the CFO to the Committee, if any, during the certification process regarding any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting, or any fraud involving management or other employees who have a

significant role in the Company's internal control over financial reporting;

(b) management's conclusions about the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting, and about any significant changes to the Company's internal control over financial reporting;

(c) management's annual report on, and the independent auditor's evaluation of the effectiveness of, the Company's internal control over financial reporting; and

(d) on an annual basis, the Company's decision to enter into swaps and other derivatives transactions that are exempt from exchange execution and clearing under "end-user exception" regulations established by the Commodity Futures Trading Commission, and periodically as appropriate review and approve the Company's policies governing the Company's use of swaps and other derivatives transactions subject to the end-user exception.

7. Discuss with management the Company's earnings press releases (including the use of nonGAAP information and any reconciliation thereof to GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentation to be made). The chairperson may represent the entire Committee for purposes of this review.

77. With respect to Compliance Oversight Responsibilities, the Audit Committee shall:

8. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

9. Review and, if appropriate, approve waivers of the Company's Code of Conduct with respect to executive officers and directors.

10. Review with management:

(a) the policies and procedures designed to promote the Company's compliance with laws and regulations, the Company's compliance with laws and regulations and any other legal or regulatory matters that may have a material impact on the Company's financial statements;

(b) the Company's Code of Conduct, the policies and procedures designed to promote and monitor compliance with the Code of Conduct, and the results of such monitoring;

(c) any material reports or inquiries from regulators or government agencies; and

(d) the Company's risk assessment and risk management policies, including major financial risk exposures, risks relating to data privacy, cybersecurity and climate change, and the steps management has taken to monitor and mitigate such exposures and risks.

## SUBSTANTIVE ALLEGATIONS

### *Background*

78. Headquartered in Washington, D.C., Danaher operates as a diversified multinational enterprise structured around multiple strategic platforms.

79. Beginning in 2015, the Company completed a series of blockbuster transactions to grow its Life Sciences segment, including acquisitions of Pall Corporation ("Pall"), a manufacturer of filtration, separation, and purification tools, for nearly $14 billion in August 2015, as well as a March 2020 acquisition of General Electric Company's biopharmaceutical support business, known as GE Life Sciences, for over $21 billion, which was then renamed "Cytiva." Additionally, the Company acquired nucleic acid and genomic product pioneer, Integrated DNA Technologies, Inc. ("IDT"), for approximately $2 billion in April 2019. The Company also expanded its Diagnostics segment through a November 2016 acquisition of Cepheid, a molecular testing company, for approximately $4 billion.

80. Danaher's Biotechnology group, composed primarily by Cytiva and Pall, is a global provider of technologies, services, and expertise purported to help researchers and biopharmaceutical producers advance the development, manufacturing, and delivery of various therapeutics. The Company's Diagnostics group offers clinical instruments, reagents, consumables, software and services that hospitals, physicians' offices, reference laboratories and other critical care settings use to diagnose disease and make treatment decisions.

81. Bioprocessing is a branch of the Company's Life Sciences segment. Danaher's bioprocessing operations occupied a central position within the Company's overall business model and public identity. As a result, the significance of developments affecting bioprocessing was necessarily known to senior management and the Board, including the Individual Defendants. The Company repeatedly held bioprocessing out as a foundational component of its science- and technology-driven growth strategy and treated the business as a principal engine of both revenue and innovation.

82. From an operational and financial perspective, bioprocessing represented the dominant component of Danaher's Life Sciences activities. Before September 2022, it was the largest business within the Life Sciences segment. After Danaher reorganized its reporting structure and separated bioprocessing into a standalone Biotechnology segment, the business generated approximately $7.5 billion of the $8.5 billion in revenue attributed to that segment—representing roughly 88% of Biotechnology revenues. On a Company-wide basis, bioprocessing accounted for approximately one-quarter of Danaher's $31.47 billion in total sales during 2022. Excluding the Environmental and Applied Solutions segment, which was slated for divestiture in late 2023, bioprocessing would have represented nearly 30% of Danaher's total revenue.

83. Danaher's leadership treated bioprocessing—principally through Cytiva and Pall—as a crown-jewel business on which the Company staked substantial capital and long-term expectations. The Company invested approximately $35 billion to acquire Cytiva and Pall, and management described the combined business as offering an unparalleled range of biomanufacturing products across the industry. Defendant Blair characterized the unit as an "$8.5 billion growth juggernaut" and stated in January 2023 that management anticipated significant future expansion of the bioprocessing business. Reflecting its importance, Danaher dedicated its

September 2022 Analyst and Investor Day entirely to bioprocessing, underscoring that the business was viewed as critical to the Company's future trajectory.

84. The COVID-19 pandemic increased demand for the Company's diagnostic tests and related biotechnology products. For instance, in February 2020, in response to the growing COVID-19 pandemic, the United States Department of Health and Human Services provided the United States Food and Drug Administration ("FDA") with the power to issue emergency use authorization ("EUA") permitting the sale and use of unapproved tests for the diagnosis or detection of the virus causing COVID-19 under certain circumstances. Approximately one week later, on February 10, 2020, the Company's IDT business released a COVID-19 primer and probe kit using DNA sequence specifications previously published by the Centers for Disease Control and Prevention ("CDC") for use in primers and probes as a product for companies interested in commercializing polymerase chain reaction tests pursuant to a potential FDA EUA. By the time the CDC discontinued its test kit design protocol on December 31, 2021, IDT was one of just two companies with primer and probe kits qualified under the CDC's EUA.

85. Additionally, on March 20, 2020, the FDA granted EUA for a new molecular test developed by the Company's Cepheid business to detect severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), the virus responsible for COVID-19.

86. Similarly, the COVID-19 pandemic increased demand for the Company's equipment and services used by customers to develop and produce new biotherapeutic candidates, including vaccines. Throughout 2020 and 2021, many of the Company's bioprocessing customers were racing to develop and produce vaccines and other therapeutics to treat COVID-19 throughout the world, and the Company's Cytiva and Pall businesses experienced a surge in demand for machinery, consumables, and services related thereto.

87. By late 2021 and early 2022, however, it became increasingly clear that COVID-19 would turn endemic, becoming consistently present in the human population. One review published by researchers in March 2022 in *Science*, declared that "[i]t is inevitable that SARS-CoV-2 will become an endemic pathogen[,]" noting that the disease's "impact on our health and daily lives will change considerably over time."[5]

88. Danaher claimed to employ formal systems and recurring practices to track customer demand for its bioprocessing products and services, including customer inventory levels, production schedules, and purchasing plans. According to statements by defendant Blair in 2021, 2022, and 2023, Danaher's operating companies maintained constant dialogue with customers in order to understand demand trends, inventory positioning, and evolving production needs. The intensity of these customer interactions increased during and after the COVID-19 pandemic, particularly within the bioprocessing business. Danaher executives described conducting regular surveys and maintaining unusually close working relationships with large pharmaceutical customers as a result of pandemic-driven collaboration. Management also emphasized that these interactions extended specifically to understanding customer inventory levels and preventing excess stockpiling. Defendant Blair stated on multiple occasions in 2022 that Danaher worked closely with customers to monitor inventory buildup and production plans, including through recurring surveys conducted during and after the period of supply-chain constraints caused by the pandemic. Members of Danaher's senior management also made public statements indicating that they were aware of and relied upon customer feedback obtained through empirical surveys when discussing market trends and demand conditions.

[5] Katia Koelle, et al, *The Changing Epidemiology of SARS-CoV-2*, SCIENCE, Mar. 11, 2022, at 81.

89. The Individual Defendants acknowledged during the pandemic that COVID-19 had materially accelerated Danaher's business performance in 2020 and 2021. At the same time, the Individual Defendants recognized that the extraordinary conditions driving pandemic-era demand would not persist indefinitely. As described further below, the Individual Defendants advised the market that future performance modeling would exclude pandemic-related tailwinds. These acknowledgments carried particular weight because one of the largest contributors to Danaher's revenue at the time was its bioprocessing business within the Life Sciences segment—a business that had seen substantial demand during the pandemic. By the end of 2021, Cytiva and Pall were expected to generate approximately $7.5 billion in annual revenue from bioprocessing activities, representing more than 25% of Danaher's total revenue for that year.

***Materially False and Misleading Statements***

90. Instead of disclosing the truth, the Individual Defendants caused Danaher to issue a series of materially false or misleading statements concealing how COVID-19's endemic phase would impact demand for the Company's products. On January 27, 2022, the Company issued a press release announcing its financial results for the quarter and year ended December 31, 2021 (the "4Q21 Press Release"). In the 4Q21 Press Release, Defendant Blair was quoted stating that "[o]ver the last several years, our portfolio has undergone a significant, purpose-driven transformation. We're a better, stronger company today, comprised of high-quality, market-leading franchises in attractive end-markets. ***We believe the combination of our exceptional portfolio, talented team and the Danaher Business System provides a strong foundation for 2022 and beyond***."[6]

[6] Unless otherwise stated, all emphasis is added.

91. The same day, Danaher hosted an earnings call for analysts and investors to discuss financial results for the quarter and full year ended December 31, 2021 (the "4Q21 Earnings Call"). During the 4Q21 Earnings Call, Defendant Blair explained that senior management expected significant long-term demand for products used to support the production of COVID-19 vaccines:

> Biopharma continues to be our strongest-performing end market within the Life Sciences. The shifts in treatment towards biologics as the standard of care and the accelerating focus on genomic therapies are driving significant investments in research, development and production capacity across the sector. . . . Now, in addition, ***we continue [to] see significant demand related to development and production of COVID-19 vaccines and therapeutics. And we expect this activity to persist longer term. Our customers are planning for ongoing production with the assumption that there will be an enduring need for effective treatment and prevention as the world transitions to approaching COVID-19 as an endemic virus.***

Blair further added that "the end of 2023, perhaps the beginning of '24, being that time frame when we call it [COVID-19] endemic with greater confidence."

92. During the 4Q21 Earnings Call, in response to an analyst's question if "any of the assumptions around vaccines and therapies changed" for the bioprocessing business, noting that "you previously talked about this $2 billion backlog [of orders] heading into the year [2022]." Defendant Blair responded "***no, our assumptions as it relates to the vaccine and therapeutics business have not changed***," and added "we're looking forward to roughly flat sales for—in the bioprocessing business for vaccine and therapeutic revenues in 2022."

93. In response to an analyst question for "clarification" on the guidance for 2022, noting that "vaccines, if I just understood you correctly, it's flattish year-on-year, which means your base Danaher ex vaccine, that's really growing at the very high end of high single[,]" Defendant Blair stated:

> So once again, just to level-set, the base business includes bioprocessing for COVID vaccines and therapeutics. It's important to note that. And, ***in fact, we see the entire base business growing both for the quarter and the full year at high***

> ***single digits. And that's driven by a number of factors. One, as you just suggested, of course, the non-COVID bioprocessing business is still growing at the low double digits that we have seen here, and that continues to be strong***. We also see our non-bioprocessing business, so as you think about our diagnostic businesses, as you think about our life science instruments and so forth, we see them growing very strongly on the back of the investments that we've made around innovation, additional feet on the street and really driving the growth here.

94. Following this exchange, Cowen analyst Dan Brennan asked in the 4Q21 Earnings Call if there was any potential "upside" to the low double-digit growth in the non-COVID bioprocessing business over the next couple of years. Defendant Blair responded:

> ***So we do continue to talk about the low double-digit growth rate for the non-COVID bioprocessing business***. That's what we've seen for many quarters. But we also talked about the fact that our backlog continues to build there. . . . ***And so could there be upside? Sure, there could be. . . . But for now, low double digits in the non-COVID bioprocessing business is a good planning number***.

95. Another analyst asked during the 4Q21 Earnings Call for further clarification on the "cadence" in bioprocessing going forward, stating "[i]t sounded like '22 is a decent proxy where maybe COVID comes down and you shake out somewhere in the mid-high single digits as a whole for that kind of $7.5 billion business." In response, Defendant Blair stated:

> No, ***I think that's right. As we look at 2022, I mentioned the COVID-related vaccine and therapeutic bioprocessing business, they'll probably be roughly flat here in 2022***. Again, the assumption being that we're starting to see the pandemic going endemic on the one hand. On the other hand, what you start seeing to happen is, if you will, we're going from 1.0 compounds to 2.0. . . . So we think that that's a good baseline to move forward with and how to think about it. ***And we've continued to view, as we've said in our long-term guide around the bioprocessing business, that that's a high single-digit grower. And I think that's the way to think about it in '22. And, as we said, we think '23 will look a lot like '22 as well***.

96. [redacted]

[redacted]

97. [redacted]

98. On March 8, 2022, Defendants Blair and McGrew attended the 42nd Annual Cowen Healthcare Conference. (the "Cowen Conference"). During the Cowen Conference, Defendant Blair emphasized that the Company's future growth would be fueled by the non-COVID business in bioprocessing:

> Well, first of all, let's level set on '22 and how we think about that. First of all, there, we're talking about our base business, so non-COVID testing—or, let me say it this way, COVID testing not included—growing high single digits. And that the COVID headwind represents about 200 to 300 basis points. So we're stepping down from the 60 million tests in 2021 to 50 million tests here in 2022. And that gives you a mid-single-digit [core sales] growth. And, quite frankly, we think that, that mid-single-digit growth in 2022 shows pretty well versus our peers and shows the strength of our business models and the strength of our base business. ***Now, as you unpack that, then, we see bioprocessing as a part of that base business in the high single-digit, low-double digit with strong activity levels. Yes, there's therapeutics and vaccines related to COVID. But as importantly, or if not more so, the size of the monoclonal antibody market, which continues to grow, the number of projects there going through the pipeline is 50% higher than it was just 5 years ago. Cell and gene therapy projects that are making their way through the clinic and ultimately being commercialized, there is a huge amount of leverage in that funnel. And we feel that, that really is the most important aspect here to take away***.

99. In response to a question at the Cowen Conference concerning whether it was still appropriate to expect $2 billion in annual revenue for COVID vaccines and therapeutics in bioprocessing, Defendant Blair stated:

> ***I mean, we continue to believe that our backlog and our numbers are solid to be able to reach that and support that expectation that we put out there. And we continue to see orders coming in here for existing programs that have been very successful and new programs that are trying to address the complexities of the latest variants, whether that's from a vaccine or a therapeutic perspective. So we feel good about what that represents. But most importantly, we have seen that our non-COVID bioprocessing business is well into the low double digits in terms of growth as it has been in the last quarters. We continue to see that, that business is strong, continues to grow. And we've said that our COVID therapeutic vaccine business will be flattish year-over-year here. And I think that's still the right way to think about it so much so that we put that business into the base now and talk about bioprocessing, all in high single digits, low double digits for the year 2022.***

100. Defendant Blair further emphasized during the Cowen Conference that the non-COVID business would continue to sustain growth in bioprocessing for the long term stating, in relevant part:

> I don't think anybody knows what COVID does with variants in 2023 and what new vaccines and therapeutics might be in development for them. ***But what we do see is the incredible strength that we see on the monoclonal antibody, cell and gene therapy, bi-specifics and many other types of modalities in the biologic framework, if you will. And we see those, really, as the long-term drivers of the growth. And COVID is going to do what it does, but our team is going to continue to deliver that high single digits kind of growth here for the long term***.

101. On March 30, 2022, the Company filed a proxy statement on Schedule 14A with the SEC (the "2022 Proxy"). The 2022 Proxy assured investors that the Company was sufficiently overseeing risks to the Company, and that the Company had internal controls in place, stating, in relevant part:

> The Board's role in risk oversight at the Company is consistent with our leadership structure, with management having day-to-day responsibility for assessing and managing our risk exposure and the Board and its committees overseeing those efforts, with particular emphasis on the most significant risks facing the Company. On an annual basis, the Company's Risk Committee (consisting of members of senior management) inventories, assesses and prioritizes the most significant risks facing the Company as well as related mitigation efforts and provides a report to the Board. With respect to the manner in which the Board's risk oversight function impacts the Board's leadership structure, as described above, our Board believes that Mr. Steven Rales' management experience and tenure help the Board to more effectively exercise its risk oversight function.

> The Board administers its risk oversight responsibilities both through active review and discussion of key risks facing the Company and by delegating certain risk oversight responsibilities to the Board committees for further consideration and evaluation. Generally, each committee has responsibility to identify and address risks that are associated with the purpose of, and responsibilities delegated to, that committee. Each committee reports to the full Board on a regular basis, including as appropriate with respect to the committee's risk oversight activities.

102. On April 21, 2022, the Company hosted an earnings call for analysts and investors to discuss the Company's financial results for the first quarter of 2022 (the "1Q22 Earnings Call"). During the 1Q22 Earnings Call, in response to a question concerning whether customers had been "stockpiling" inventory in the Diagnostics segment or the bioprocessing business of the Life Sciences segment, Defendant Blair stated:

> Now if we switch gears briefly and go to the topic of stockpiling, ***we are very, very sensitive to this particular topic and stay extremely close with our customers***. As an example, in the first quarter, Cepheid continued to be sold out. If you think about bioprocessing, this is an area where there continues to be in the industry manufacturing constraints. ***So we are very, very close to our customers, working together with them, with their manufacturing schedules to ensure that we're able to not only meet their needs but also to ensure that we don't have inventory buildup in the system***. So could there be pockets of that? Perhaps on the margin, but ***generally speaking, we don't see a significant buildup in the supply chain***.

103. In response to a question about whether senior management was still "confident" that Danaher would achieve $2 billion in sales of equipment and services supporting the production of COVID-19 vaccines and therapeutics, Defendant Blair stated, in relevant part:

> Now if you look at our first quarter last year, our sales were up over 70%. And, so, if you look at the 2-year stack for Q1, we're in the 35% to 40% growth area, which we think is very robust and more than representative of what is going on in the market and think that that compares extremely well. In fact, we still think that we're taking share there. So that's sort of one marker that I want you to have. And then the second point is the order activity continues to be very, very strong. Last year, our orders in the first quarter were up over 90%. And, so, we anticipated that our orders in Q1 of this year would be down, but nonetheless, we continue to build backlog here in Q1 as well in the bioprocessing area. ***And this is why we're so confident in our core growth guide here for the year in bioprocessing of high single digit, low double digits between the robust growth that we're seeing and***

> ***the backlog that we have, that's really important***.

104. Defendant Blair further emphasized in the 1Q22 Earnings Call that growth in non-COVID business would make up for any changes in COVID activity levels and continue to allow the Company to meet its annual target for bioprocessing, stating:

> So now let's unpack that a little bit and think about what's going on and why ***COVID is sort of one variable, but that there are other variables here that are incredibly important and explain why we talk about the bioprocessing business and its growth in aggregate***. So first of all, if you think about the activity levels outside of COVID in the bioprocessing business, it's important to see what's going on in clinical trials. And I've talked about this, but you know that the project pipeline for monoclonal antibodies is 50% larger today than it was 5 years ago. For cell and gene therapy, it's 10x larger, driving extraordinary activity here in the clinical trial area. And what you see, and as I mentioned in the opening comments, you see customers really starting to focus on these new projects across all modalities and not just allocating the resources to COVID but to these new modalities. So that's really important to note that customer activity level continues to be very, very high, and that plays through in the clinical trials. Now another point to take here is monoclonal antibodies are becoming the standard of care and the predominant class of biologic drugs. So what's going on in monoclonal antibodies is the primary growth driver in the market and also for our business. . . . And then you add to that that emerging markets and high-growth markets such as China and India are starting to have access to these monoclonal antibody treatments. That provides additional and significant volume leverage. At the same time, you have biosimilar growth, Vijay. So these biosimilars are leveraging the fact that some of the biologic drugs, monoclonal antibodies that are higher volume are starting to come off patent, and that's increasing the penetration of those drugs throughout the world where the penetration has been lower. And that's providing another growth impetus. And then lastly, and I'll stop with this now, we've been talking a lot about single-use technology and their adoption for a while, which is an additional leverage growth vector within the bioprocessing business. So all that helps the activity that we talked about provides for volume, but SUT [single use technology] on top of that is substituting more traditional technologies and is growing even faster. And we have well over $1 billion of single-use technology. . . . ***So we feel very confident on the basis of what's going on outside of COVID. And that's why we look at it together because it's the aggregate that we look at and that really ultimately count that that will drive that high single-digit, low double-digit growth here for 2022 and also supports our high single-digit perspective beyond that***.

105. Defendant Blair also reiterated during the 1Q22 Earnings Call that non-COVID sales would make up changes in COVID-related sales within bioprocessing for the remainder of

the year, stating:

> ***Really, the way we're thinking about that business is, again, in aggregate, and we do believe that both the underlying strength of the markets, as I just laid out, as well as the strength of our backlog, which continues to grow, support both the high single-digit, low double-digit bioprocessing guide for the year***. And as you think about COVID within that, COVID's going to do what it does, but there is a larger market that is growing rapidly. And we're going to continue to see fluctuation as it relates to COVID volumes, whether there's a decision on booster shots for different age groups, whether it becomes part of an annualized immunization regimen. All of these are open questions. And ***our belief is that*** COVID is a part of our business, but ***there is another part of this business which is larger, it is growing at a faster rate and we are making investments to ensure that we capture the appropriate shares here. So, Dan, high single-digit, low double-digit bioprocessing growth for 2022***.

106. Later during the 1Q22 Earnings Call, Defendant Blair again emphasized the strength of the business lines unrelated to COVID-19, stating:

> So, Luke, the way we're thinking about that is the strength of our underlying business, which I laid out here in some details, some clinical trials, mAbs, biosimilar volumes—keep in mind, it's the commercialized drugs that really drive volume here in this business—and, then, of course, that additional growth accelerator of the single-use technology adoption. Those are really the foundations that are driving the growth of this business. ***And the COVID business, it will do what it does, but that variation is within the realm of what we have been casting as the overall growth rate of the business. And so, you take the backlog, which continues to grow quarter-over-quarter, and you take the growth drivers that I've laid out, that is what supports the high single-digit, low double-digit growth for 2022 and the high single-digit longer-term growth guide that we've talked about***.

107. On May 11, 2022, Defendant Blair presented at the 2022 Bank of America Healthcare Conference (the "Bank of America Conference"). During the Bank of America Conference, when asked to "clarify" the Company's COVID exposure in its outlook, Defendant Blair advised that the COVID business was expected to fall short of previous expectations by approximately $500 million to $600 million but emphasized the shortfall would be made up for by the non-COVID business stating, in relevant part:

> Well, first of all, let's level set on what ***the guide is for the bioprocessing business here for the full year of 2022***, which ***is high single, low double-digit growth***. . . .

> But what is included in that guide and what is accounted for in that guide is that the COVID vaccine and therapeutic revenue could be down by $500 million to $600 million. So that's already included in that high single-digit, double-digit total bioprocessing business. ***And the way we make that happen is that the far larger parts of the non-COVID therapeutic and vaccine business is growing at mid-teens plus, and that is really what's driving the overall guide of high single digits, low double digits for 2022.***

108. Defendant Blair specifically attributed the updated forecast to recent developments with the Company's customers, stating:

> ***[W]e've seen some cancellations as customers will no longer pursue a COVID project***, but in fact, they take the raw materials that they have acquired, and they apply those to the next project that they're working on. We see some delays where people say, "Look, my next project's starting up in 60 days instead of right away." ***So we see all of that, but we feel that, that would be accounted for in the $500 million to $600 million that we talked about***.

109. Later during the Bank of America Conference, in response to a question concerning the upside potential for the Company's long-term outlook of mid-single digit plus core revenue growth, Defendant Blair stated:

> Well, the plus really comes from the repositioning that I started off with. If you think about Danaher previously, we were a low to mid-single-digit kind of grower. I mentioned earlier the spins of Fortive, Envista and that we brought on many other companies, which I won't name again. And, then, even there, what we see is that Cytiva is growing faster than we had originally thought. We thought it was more like a 6% to 7% grower. Now we see it more firmly in the high single digits. And then, of course, molecular diagnostics used to be less than 5% of our business. Now it's over 10%. And so, what we're saying here, and we see this for the long term, we're trying to avoid rebasing our business with a different year or that sort of thing. ***We're just saying, look, this is a really robust portfolio. It is not a cyclical portfolio. It is well entrenched in attractive end markets. And we see the likelihood of being—growing faster than mid-single digits to be high***.

110. With respect to whether Danaher was worried about the biotech funding environment, Defendant Blair stated:

> ***So I don't worry much about that funding environment***. And let me, again, piece that apart a little bit. First of all, ***when you do the analysis of the biotech sector and you look at the balance sheet of the great majority of the players***, the average cash with—given ***the average burn rates is between 12 and 18 months***. Sure,

> there's some at 6 months, and then there's others at 18 or 24, but let's just say the average is right around 18 months. ***And we think that that's quite significant and that will continue these innovators to keep driving towards hopefully lifesaving or certainly life-improving therapeutics***. But I think when you step back for a second and you put biotech funding in relation to the bioprocess business, the most important thing to remember is that the bioprocess business is volume-driven. It is volume-driven. It's not the number of projects. It's the volume per project that makes a difference. And with that, that means that commercial drugs and drugs that are really in the Phase III volumes are the ones that drive this business. ***And the ones that are earlier stage, including those early-stage biotechs, have an impact but only at the margin. It is not a driver of the growth of the business. . . . But from our perspective, this is not something that will have an impact here on the business in the short term***.

111. [redacted]

112. [redacted]

113. On July 21, 2022, the Company issued a press release announcing its financial results for the second quarter ended July 1, 2022 (the "2Q22 Press Release"). In 2Q22 Press Release, Defendant Blair was quoted as stating: "***Danaher is comprised of high-quality franchises*** in attractive end markets with meaningful recurring revenues ***and durable business models. We believe the combination of our strong portfolio and talented team—all powered by the Danaher***

***Business System—provides a strong foundation in today's dynamic operating environment and positions us well for the balance of 2022 and beyond.***"

114. On the same day, the Company hosted an earnings call for analysts and investors to discuss financial results for the second quarter of 2022 (the "2Q22 Earnings Call"). During the 2Q22 Earnings Call, Defendant Blair represented that the Company maintained close contact with its bioprocessing customers to quell concerns about overstocking stating, in relevant part:

> In our bioprocessing business, we continue to see record activity levels from early-stage research to later-stage development and production which drove a combined core revenue growth rate of high single digits at Cytiva and Pall Biotech. Our backlog and our order levels remain very healthy, and ***as always we're working closely with customers to ensure they have the right inventory levels to support their planned activity***.

115. Defendant Blair also disclosed that Danaher now expected the bioprocessing business to earn only $1 billion in revenues for products and services related to COVID-19, but reiterated that non-COVID revenues would compensate for the miss, stating:

> We are seeing our customers continue the healthy transition away from COVID-19 vaccines and therapies and into previously paused and new programs for other modalities. As a result, ***we now expect COVID-19 vaccine and therapeutic revenue of approximately $1 billion in 2022 down from approximately $2 billion in 2021. Now, that said, there's no change to our high single to low double-digit core revenue growth outlook in our bioprocessing business for the year as customers are accelerating their investments across all other major therapeutic modalities***.

116. Also during the 2Q22 Earnings Call, Defendant Blair further highlighted that activity levels in the end market for the bioprocessing business would provide a runway for very strong growth for years to come, stating:

> The biologics market remains very healthy as evidenced by the increasing number of treatments in development and production. Today, there are over 1,500 monoclonal antibody-based therapies in development globally, which is up more than 50% from just 5 years ago. This is being driven by both novel molecules in development and the proliferation of biosimilars, which are helping to accelerate adoption in underserved markets as patents on higher-volume therapies expire.

> There are also over 2,000 cell and gene therapy candidates in development today, a more than tenfold increase over the last several years. ***And given this backdrop of such a significant and sustained increase in activity, we expect the growth rate in this market to remain very strong for many years to come***.

117. In response to a question asked during the 2Q22 Earnings Call concerning whether the growth rate for the bioprocessing products and services unrelated to COVID-19 were "sustainable" for 2023 and beyond, Defendant Blair stated:

> I think the way we see it is the following way. Let's level set on '22 here where, in the COVID business, we see revenues going from 2021 $2 billion to 2022 $1 billion. The non-COVID business, as you suggested, has accelerated here as customers are moving to non-COVID modalities and all sources of them, very broad-based. And, of course, on the margin, price ends up helping that as well. ***So we would expect certainly for '23 to continue to see elevated levels of non-COVID activity, probably above the low double digits that we have seen historically. Too early to say if it stays up over 20%, but certainly elevated in '23 versus what it's been historically***.

118. With respect to a question on the Company's bioprocessing business, Defendant Blair stated, in relevant part:

> ***Now, as we think about our 2023 guide—which I think is what a part of your question was trying to tease out—we feel good about our mid-single-digit plus positioning there where for the long term***, which we have talked about in a number of occasions. And when you unpack that a little bit, ***we see bioprocessing to be up high single digits and that's consistent with what we've spoken of. And, as you look at bioprocessing, there, we continue to think that the non-COVID business is going to be growing very strong***. You saw what we're doing here in the second half of the year with growth rates well over 20% in non-COVID. ***And then we've also derisked the discussion here relating COVID related therapeutics and vaccines. We see $1 billion of revenue in 2022. That's down from $2 billion in '21. And we probably say $500 million for 2023***. So 2021 $2 billion, ***2022 $1 billion, and 2023 $500 million for COVID-related vaccines. And, having said all that, we still see our biotechnology business growing at high single digits***.

119. Furthermore, during the 2Q22 Earnings Call, in response to an analyst inquiry for insight on whether Danaher has seen a shift in demand from its biotech customer segment within bioprocessing, Defendant Blair stated:

> Rachel, as you just suggested, the majority of these biotechs are either preclinical

or in the very early stages of clinical. And it's really important to note that our business is driven by what's happening in Phase III and ultimately commercialized drugs. Over 75% of our business is in that later stage. And so, then, as you go upstream from that, that has less of an impact. ***Now, getting specifically to your point, we really haven't seen much of an impact of the biotech funding crunch here affecting the customer activity levels that we have***. And, frankly, we do look at these biotechs and the proposals that they are pursuing whether there's proof of concept and data. And our sense is that the good projects and where the data is solid and convincing and proof of concept is given, they are continuing to attract funding. ***So we think that today's cash positions in the biotechs, the quality of the projects that they are pursuing, as well as the funding environment still providing funding to those that are able to provide data continues to be quite positive and is not impacting our business***. Now, of course, to your longer-term question, we just have to see that the biotech area is a cauldron of innovation. . . . So we, of course, longer term, will want to see that the funding continues to support that kind of innovation environment but today, are ***not concerned about what we see here for the next, call it, 18, 24 months***.

120. [redacted]

121. On September 15, 2022, the Company hosted a live webcast focused on bioprocessing for its annual investor and analyst meeting from Cytiva's North American headquarters in Marlborough, Massachusetts (the "Investor Day Conference"). During the Investor Day Conference, Defendant Blair reminded listeners to the call that the bioprocessing business boasted a high single digit long-term outlook, stating:

> So we think that our growth rerates higher for the long term. Then you say, well, why do you think that? Well, let's have a look at the left here, where you see ***Cytiva and Pall together representing a $7.5 billion bioprocessing franchise growing high single digits for the long term***. . . .

122. Defendant Ligner, the head of the Company's Biotechnology group, offered a similar outlook for the Biotechnology segment, stating:

> Cytiva was a transformational addition to the life science platform. Pall Life Science is also very similar to Cytiva, a leader in filtration and in single-use technology with extreme talent, expert in material science, and leading around membranes and filtration technology. . . . ***We're taking those 2 outstanding companies and putting them together. We're creating an undisputed leaders in the bioprocessing***, $8.5 billion of revenue, ***anticipating long-term performance of high single digits***.

123. Later during the Investor Day Conference, Defendant Ligner reiterated the same outlook for bioprocessing business of the Biotechnology group, stating:

> Today, our bioprocessing business is $7.5 billion, of which a single-use technology is in excess of $1 billion, and ***we really anticipate a long-term growth rate of high single digit***. Cytiva and Pall together is an incredible offering to the customer and, therefore, in an incredible position. We are so much stronger together, and this is why we are doing it.

124. Providing a summary of his presentation during the Investor Day Conference, Defendant Ligner stated:

> I'm going just to very quickly wrap up and summarize before we move to our Q&A session. We're creating and absolutely leaders in the bioprocessing industry. Pall and Cytiva, together, it is a stronger offering for our customers. . . . So the Biotechnology group is now a leader across all modalities, including monoclonal antibody, cell and gene therapy, and mRNA. ***We have a strong secular driver in biologics***, which creates significant long-term growth opportunity and ***the long-term projection of high single digit***, uniquely positioned for the most comprehensive offering best-in-class services, support, and scale: scale of manufacturing, scale of talent, scale of commercial, scale of organic, and the ability with the Danaher Business System to continuously improve our service to customers.

125. During the Investor Day Conference, when asked for more details on the sustainability of the high single digit growth rate for the bioprocessing business, Defendant Blair

stated:

> First of all, it's very clear that we're coming with a tailwind that is based on COVID therapeutics as well as vaccines. And, as those wane, and we have called that out pretty clearly, right: $2 billion in 2021, ***$1 billion here in 2022, and we'd expect $500 million or so in 2023***. At the same time, ***we have the non-COVID applications growing at very fast rates, and we've talked about those being in the mid-teens plus here. And that's what we're currently seeing, and that's what our order book shows here going forward. And when we come to the high single digits, it's once again a perspective that is not tied to any single year in the dynamics of any single year, but to say, this is the kind of very positive scaled market growth that we see***.

126. [redacted]

127. On October 20, 2022, the Company issued a press release announcing financial results for the third quarter ended September 30, 2022 (the "3Q22 Press Release"). In the 3Q22 Press Release, Defendant Blair was quoted as stating: "Our growth was broad-based across all three segments, ***a testament to the durability and attractive end-market positioning of the franchises that comprise Danaher***. . . . As we look ahead we believe the strength of our portfolio combined with our talented team and the power of the Danaher Business System ***provides a strong foundation to continue delivering meaningful shareholder value through 2022 and beyond***."

128. On the same day, the Company hosted an earnings call with analysts and investors to discuss third quarter of 2022 (the "3Q22 Earnings Call"). During the 3Q22 Earnings Call, Defendants advised that the Company expected the bioprocessing business to only generate $800 million in COVID-related sales 2022, and deliver high single digit growth for 2022. In response

to an analyst question concerning any changes to the previously-reported outlook, Defendant Blair confirmed, stating:

> [A]s we think about the bioprocessing business for 2023, ***we still think that there is room for $500 million of COVID opportunity*** in order to support the needs of the population, the variance, to replenish expired sell-by dates and all the things that you can think about. But, of course, that's a number that we watch very closely. ***More importantly, we think that the non-COVID business, which, of course, will again proportionately be a much larger part of the business will continue to be very robust***. Funding levels are there, the number of modalities that continue to grow in the pipeline is broad. Our own project activity in early, mid and late stage is very strong. ***So we do not have a different view on 2023 for bioprocessing today***.

129. When asked about whether the sensitivity was "on the vaccine side but not on the base," Defendant Blair confirmed the accuracy of the questioner's assessment, stating:

> ***That's correct. That's the way we see it for sure today.*** And, recall, I mentioned just a minute ago to Derik that, in 2022, we were expecting $1 billion of COVID vaccine and therapeutic revenue. We've taken that down to $800 million. ***It is, of course, offset by the non-COVID business so that we deliver that high-single digits here in 2023 [sic] for bioprocess. And then looking forward to 2023, we would see that going from $800 million to $500 million***.

130. During the 3Q22 Earnings Call, with respect to the impact of inventory stocking on the 2023 outlook for the bioprocessing business, Defendant Blair stated, in relevant part:

> We have been, as a result of the pandemic, even closer than traditionally working with our customers to understand their production plans and to ensure that they are not overstocking at the expense of others who would need the product in what was a time of constraint here for the last, call it, 18, 20 months. ***So, as a result of that, we feel as though we are well positioned to understand the inventory situation***. We do regular surveys with our customers. ***And, as a result of that, we don't believe that there is a general overstocking in the market. Having said that, we do think there are pockets where inventories are high. And those are based on customers ultimately changing their production plans, in other words, canceling orders specifically for COVID***. And, so, the large COVID players whether that be for vaccine production or whether that be for therapeutics production, they have larger inventories, and those will likely exceed 6 months of inventory. ***But I think it's important to note that those large players have many programs, and they're able to redeploy that inventory. . . . So we are confident that the strength of this market and its fundamentals remain very, very strong***.

131. Also during the 3Q22 Earnings Call, in response to a question on the non-COVID

order book in bioprocessing, Defendant Blair stated, in relevant part:

> So, for Q3, our orders are down over 20%, as expected. And I think that's a number which bears some commentary and context. First of all, we're coming off of order comps that are well in excess of 50% in the prior year. . . . ***And I think something that is perhaps not as well-known and that bears some conversation is we and many others have meaningfully reduced our lead time. . . . And that's a pretty significant impact on the order placement cadence of our customers***. So just to mention an example here, if lead times go from 52 weeks, which has been the case in some product categories in the marketplace, to 12 weeks, customers fundamentally change their order patterns. To give you a sense of that, if a customer wanted to order over time 4 bioreactors, they would order all 4 bioreactors at once if there's a 52-week lead time. But if it's a 12-week lead time, they would order 1 bioreactor and then follow up with other orders in the future. ***So what we're seeing right now is really the normalization of the marketplace coming from a red-hot pandemic fueled time of constraint, as long lead time for orders ramped up significantly. So order rates ramped up significantly to the supply chain now normalizing and customers adjusting their order cadence. . . . So the orders were negative, to repeat, but not unexpectedly and to be seen in the context of a market that is now readjusting***.

132. On November 30, 2022, Defendants Blair and McGrew presented at the Evercore HealthCONx Conference (the "Evercore Conference"). At the beginning of the Evercore Conference, Defendant Blair offered the following outlook for 2023: "Now as we look forward here to sort of 2023 and beyond, our portfolio and our DBS base ability to out execute is unique. ***And when you couple that with our 75% recurring revenue that's supported by attractive really low cyclical end markets, I think that speaks really well for what's to come***."

133. With respect to the bioprocessing business in 2023, in particular, Defendant Blair stated:

> [A]s we think about, looking forward, the range of outcomes looks something like this. The revenue for 2023 non-COVID could be in the mid-teens. That's representative of what the 3-year CAGR has been. It's been mid- to high-teens, so it could be mid- to high-teens. It could also be what it's been sort of the last year, which is well over 25%, as you suggested in your question, certainly, that could be one outcome. Or perhaps it just settles back into the high single-digit, low double-digit longer-term growth rate that we've spoken about. ***Now I think our view is that while that's the total range, it's probably more likely that it is between the high-single digit and mid-teen range, but there is that number out there of well over***

***20%. But somewhere in between that range is how we see 2023 playing out***.

134. Also at the Evercore Conference, Defendant Blair highlighted that recent stocking dynamics did not pose a threat to the Company's previously announced outlook for its bioprocessing business in 2023, stating:

> So as we've said pretty consistently that as you look at the broader marketplace, ***we really don't see an enormous amount of stocking going on***. In fact, it wasn't until very recently that we got out of the hand-to-mouth sort of supply situation with the constraints that occurred in the supply chain through the pandemic-related demands. Now having said that, and I think I've been clear here that ***there are pockets where there has been some inventory buildup and they tend to be related to customers who had larger COVID-related programs***, whether that's a vaccine or whether that's a therapeutic, they've either not had the kind of demand drawdown that they expected because the vaccination rate is lower or the variance made a particular therapeutic no longer relevant or because they've canceled the program entirely. So you have sort of the full gamut of potential there. ***But those are really just pockets with larger players who are quite well positioned to draw that down. And so how does that make us think about 2023? Well, we've already said, look, for 2023, we think our COVID demand goes from the $800 million I just spoke of to the $500 million, right? So you see the manifestation of what I just spoke of sort of these pockets in that change there, and that's what we're currently expecting for COVID in 2023***.

135. In response to a question at the Evercore Conference concerning whether the $500 million COVID-related revenue outlook was "aggressive" or based on "visibility" in the order book for 2023, Defendant Blair stated:

> ***That's currently the status that we have with our customers, the $500 million***. And I think our customers regularly review vaccination rates, new approvals that they get around the world in various countries. ***And so that's what we think that's our expectation for '23***.

136. Defendant Blair assured analysts that he and the Company "really don't see an enormous amount of stocking going on," because although "there are pockets where there has been some inventory buildup and they tend to be related to customers who had larger COVID-related programs," those are "really just pockets with larger players who are quite well positioned to draw that down." The Court in the Securities Class Action held that these statements "cannot be

characterized as mere puffery, however, especially when considered alongside the shareholders' specific allegations about what business components investors were focused on." Order at 9. The Court ruled that the stockholders in the Securities Class Action plausibly alleged a section 10(b) and Rule 10b-5 claim as to this statement. *Id.* The court further noted that the defendants in the Securities Class Action "do not contest that, crediting the amended complaint's allegations, such statements would be material to a reasonable investor[.]" *Id.* The Court pointed out how the "defendants also denied any suggestion that inventory stockpiling and funding constraints were affecting sales until 2023." *Id.* at 13. The court explained that this did not coincide with the allegations stockholders made. Namely, "that by early 2022, demand for COVID-19 products had declined as the virus transitioned from pandemic to endemic and customers shifted their attention to non-COVID-19 products. … By mid-2022, larger pharmaceutical companies had stockpiled enough inventory to obviate the need to place new orders." *Id.* As a result, Judge Ali ruled that the stockholders adequately alleged scienter. *Id.*

137. [redacted]

138. [redacted]

139. On January 24, 2023, the Company issued a press release announcing financial results for the fourth quarter and year ended December 31, 2022 (the "4Q22 Press Release"). The 4Q22 Press Release provided Danaher's expected sales growth in 2023. Specifically, in a section titled, "Forecasted Core Sales Growth and Base Business Core Sales Growth," the press release represented:

| | % Change Year Ending December 31, 2023 vs. Comparable 2022 Period |
|---|---|
| Core sales growth (non-GAAP) | ***-Mid-single digit*** |
| Impact of COVID-19 related testing, vaccines and therapeutics | *+Low-double digit* |
| Base business core sales growth (non-GAAP) | ***+High-single digit*** |

140. The 4Q22 Press Release further stated, in relevant part, that "[s]tarting with the first quarter 2023, the Company will revise its definition of base business core growth to exclude revenues related to COVID-19 testing, vaccines and therapeutics, in addition to the exclusion of currency translation, acquisitions and divested product lines. . . . ***For the full year 2023, the Company anticipates non-GAAP base business core revenue to be up high-single digits***."

141. On the same day, the Company hosted an earnings call for analysts and investors to discuss financial results for the fourth quarter and full year ended December 31, 2022 (the "4Q22 Earnings Call"). During the 4Q22 Earnings Call, Defendant Blair discussed the outlook for the bioprocessing business in 2023, stating:

Looking to 2023, we expect customers to further reduce their COVID-19-related

> programs. Vaccination and booster rates have been significantly lower than initially anticipated, and the availability of alternative therapeutics has reduced the need for monoclonal antibody-based treatments. ***In light of these dynamics, we now anticipate COVID-19-related vaccine and therapeutic revenue will be approximately $150 million for the full year of 2023, down from approximately $800 million in 2022 and lower than our previous expectation of $500 million***. Our non-COVID business has averaged more than 20% growth over the past 2 years. Given these elevated growth rates, we spent the past several weeks speaking with our customers to better understand their planning assumptions for 2023. And, based on these discussions, ***we anticipate non-COVID bioprocessing core growth will be high single digits for the full year 2023. This includes low single-digit core growth in the first quarter as customers repurpose inventory purchased for COVID-19 vaccine and therapeutic programs to non-COVID projects***.

142. With respect to 2023 guidance provided for Danaher as a whole, Defendant Blair stated, in relevant part:

> So with that color on what we're seeing in our business and end markets, let's now look ahead to our expectations for the first quarter and the full year. . . . ***[F]or the full year 2023, we expect high single-digit core growth in our base business. And we also expect total core revenue growth to decline mid-single digits for the year as a result of lower demand for COVID-19 testing, vaccines and therapeutics***.

143. Later during the 4Q22 Earnings Call, in response to an analyst question concerning stocking dynamics, Defendant Blair stated, in relevant part:

> Derik, as it relates to the inventory situation, let's think about sort of our Q1 guide here as a starting point and the context for that. We expect for our overall guide to have a base business growth of mid-single digits. And we expect COVID testing, including now vaccine and therapeutics, to have high single-digit and low double-digit headwind, giving us that [core sales] decline of mid-single digits in the first quarter. Now let me come back to the base business because, of course, that's where your question resides. And, once more, we have to be clear that we have now excluded vaccine and therapeutic revenues from the base business, right? ***So our mid-single-digit base business is down from the comparable low double-digit core growth we saw in Q4 and most of 2022. And that's due mainly to bioprocessing ex COVID***. . . . Now if we look and we dig in a little bit deeper into bioprocessing, we anticipate that our non-COVID bioprocessing business will be low single digits. And that's really for two reasons. One, we're coming off of 30% growth in Q1 of 2022. ***But we're also working through the inventory pockets that we spoke about that were related primarily to COVID programs. And we do expect Q1 to be an inflection point there that we work through the majority of that in Q1 and then after that, continue to see improvement***.

144. When asked to clarify the non-COVID order book in bioprocessing during the 4Q22 Earnings Call, Defendant Blair admitted that orders were down by mid-teens in the fourth quarter 2022, but assured that this was a result of the market readjustment, stating:

> Now from a current trend perspective, in the fourth quarter, our order rate improved by over 500 basis points sequentially but was still down mid-teens, ***which was as expected as customers continued to adjust for our shorter lead times***.

145. With respect to the overall trend in bioprocessing for non-COVID sales, Defendant Blair stated:

> Now, to be clear, ***our full year 2023 guide anticipates Q1 being the low point at low single digits for the bioprocessing non-COVID core growth. And that also takes account to any inventories that might be with some of our COVID program customers, which are now being repurposed***. We're working with those customers to repurpose that inventory. ***So whatever these order dynamics, our revenue forecast for bioprocessing non-COVID in the first quarter is low single digits. We expect that to be the low point of the inventory work-off or burn-off and then move forward to what is high single-digit bioprocessing non-COVID core growth for the full year***.

146. Defendant Blair later confirmed during the 4Q22 Earnings Call that the Company still expected the bioprocessing business to generate high single digit sales growth as a whole in 2023, stating:

> [W]e did talk about the bioprocessing growth range being from high single digits to mid-teens range. ***And, as I mentioned then, and I'll confirm now, we have spent the last several weeks talking to our customers to understand their planning assumptions for the year. And the clear message is the underlying demand remains robust and unchanged***. So we continue to see monoclonal antibodies, cell therapy and gene therapy activity continue to be strong. And we're even seeing more work on mRNA on the back of its success with COVID vaccines. So while the demand is remaining solid, customers are actually not anticipating a step-up in activity. So activity remains strong and, as we've seen in prior quarters, but they're not anticipating a step-up versus what we've seen here in the last couple of years. ***And, so, as you look at the 2, 3, even 4-year stacks here, we've seen mid-teens growth CAGRs [compound annual growth rate] for bioprocessing non-COVID. So, coming back then, if you take our high single-digit bioprocessing non-COVID full year guide on the back of an approximately 30% comp from 2022, it fits right in the mid-teens range, both on a 2- and a 3-year basis***.

147. Moreover, Defendant Blair reiterated that the Company had confidence that the second half of 2023 would make up for the sales lag in the first half of the year for bioprocessing, stating:

> So as we think about burning off these inventories, you asked about the confidence in the later part of the year. And ***that confidence is based on our discussions with customers, the backlog that we have, the continued order activity that we see and that has improved over prior periods. And, so, we feel very good about the high single digits non-COVID bioprocessing growth for 2023***.

148. Defendant Blair concluded the 4Q22 Earnings Call by assuring participants that, "[f]or 2023, we see our base business growing at high single digits" across Danaher as a whole.

149. On March 29, 2023, the Company filed a proxy statement on Schedule 14A with the SEC (the "2023 Proxy"). The 2023 Proxy assured investors that the Company was sufficiently overseeing risks to the Company, and that the Company had internal controls in place, stating, in relevant part:

> The Board's role in risk oversight at the Company is consistent with our leadership structure, with management having day-to-day responsibility for assessing and managing our risk exposure and the Board and its committees overseeing those efforts, with particular emphasis on the most significant risks facing the Company. The Board administers its risk oversight responsibilities both through active review and discussion of key risks facing the Company and by delegating certain risk oversight responsibilities to the Board committees. Generally, the Board delegates risk oversight responsibility to its committees where it believes the committee's focused domain expertise will support efficient and effective oversight, and each committee typically has responsibility with respect to risks that are associated with the purpose of, and responsibilities delegated to, that committee. Each of the Audit, Compensation, Nominating and Governance, and Science and Technology Committees reports to the full Board on a regular basis, including as appropriate with respect to the committee's risk oversight activities. The timeframe over which the Board and its committees evaluate risk typically varies depending on the nature of the risk. From time to time, the Board and/or its committees may consider inputs from outside advisors with respect to certain risks and risk trends. With respect to the manner in which the Board's risk oversight function impacts the Board's leadership structure, as described above, our Board believes that Mr. Steven Rales' management experience and tenure help the Board to more effectively exercise its risk oversight function

150. On April 25, 2023, the Company issued a press release announcing financial results for the first quarter ended March 31, 2023, revising its sales growth outlook for 2023 (the "1Q23 Press Release"). Specifically, the 1Q23 Press Release stated:

| | % Change Year Ending December 31, 2023 vs. Comparable 2022 Period |
|---|---|
| Core sales (decline) growth (non-GAAP) | ***-High-single digit*** |
| Impact of COVID-19 related testing, vaccines and therapeutics | *+Low-double digit* |
| Base business core sales growth (non-GAAP) | ***+Mid-single digit*** |

151. The 1Q23 Press Release further stated that "[f]or the second quarter and full year 2023, the Company anticipates that non-GAAP ***base business core revenue will be up mid-single digits year-over-year.***"

152. On the same day, the Company hosted an earnings call for analysts and investors to discuss financial results for the first quarter of 2023 (the "1Q23 Earnings Call"). During the 1Q23 Earnings Call, Defendant Blair explained that Danaher was lowering its outlook for the bioprocessing business based on recent conversations with customers, stating, in relevant part:

> Reported revenue in our Biotechnology segment declined 16% and core revenue was down 13%. In bioprocessing, base business core revenue growth was in line with our expectations of low single digits in the first quarter. . . . ***[D]emand at our large customers, who were primarily responsible for therapies in commercial production and later-stage clinical trials, remains robust and they're steadily working through inventory they built during the pandemic. Based on our most recent customer conversations, we now expect the inventory normalization process to continue through the second half of the year. During the quarter, we also saw softer demand globally at many of our emerging biotech customers as more pronounced pressures on liquidity and funding accelerated their efforts to conserve capital leading to project delays and cancellations. In consideration of these factors, we anticipate second quarter and full year base business core growth in bioprocessing will be largely consistent with the first quarter***.

153. Notwithstanding the difficulties in bioprocessing, Defendant Blair also represented that Danaher expected to deliver the guidance provided in the 1Q23 Press Release, stating:

> Now turning to the full year 2023. ***Despite the near-term and temporary***

> ***challenges within bioprocessing, we anticipate mid-single digit core growth in our base business. We also expect total core revenue to decline high single digits for the year as a result of lower demand for COVID-19 testing, vaccines and therapeutics***.

154. During the 1Q23 Earnings Call, in response to a question for greater clarity on bioprocessing performance in China during the quarter and the trend moving forward, Defendant Blair indicated that the market would recover in the second half of the year:

> Well, as it relates to bioprocessing in China, we've had a very good and strong business there in China for years. And helped quite significantly in China in order to build the capacity for vaccines and for other biologics. And what we see today, much like we've seen in the U.S., is that the emerging biotech segment, which is an important part of China's efforts to build a local biopharma industry, is also impacted by capital constraints. So we've seen that play out in China as well. And, in fact, that's what is the primary impact on our China numbers here. . . . ***Now, as it relates to the full year in China, we expect our full year in China to be up low single digits for Danaher overall based on the market recovery, exiting COVID as well as, if you will, a normalization of the activity level in bioprocessing***.

155. [redacted]

156. [redacted]

[redacted]

157. On May 10, 2023, at the 2023 Bank of America Healthcare Conference, Defendant Blair reaffirmed the Company's recent guidance adjustment in response to a question for the Company's "latest guide" on bioprocessing, stating:

> So going forward, for the rest of the year, ***we really are expecting the same type of activity level as we saw in Q1***. And that's what we're seeing in the bioprocessing business. We continue to see that. We were 1% in the first quarter, so call it flat, and that's essentially what we're saying for the remainder of the year, expecting no change in that dynamic as the market works through these various points.

158. [redacted]

159. On July 25, 2023, the Company issued a press release announcing financial results for the second quarter of 2023 (the "2Q23 Press Release). In the 2Q23 Press Release, the Company again revised its sales growth outlook for 2023. Specifically, the press release provided:

| | % Change Year Ending December 31, 2023 vs. Comparable 2022 Period |
|---|---|
| Core sales (Decline) growth (non-GAAP) | ***-High-single digit to low-double digit*** |
| Impact of COVID-19 related testing, vaccines and therapeutics | *+Low-double digit* |
| Base business core sales growth (decline) (non-GAAP) | ***+Low-single digit*** |

160. The 2Q23 Press Release further added: "***For the full year 2023, the Company anticipates that non-GAAP base business core revenue growth will be up low-single digits year-***

***over-year***."

161. On the same day, the Company hosted an earnings call for analysts and investors to discuss its financial results for the second quarter of 2023 (the "2Q23 Earnings Call"). During the 2Q23 Earnings Call Defendant Blair reiterated the new guidance, stating:

> Now turning to the full year 2023. ***Due to near-term challenges within bioprocessing, we now anticipate low-single digit core revenue growth in our base business. We also expect total core revenue to decline high single to low double digits for the year as a result of lower demand for COVID-19 testing, vaccines, and therapeutics***.

162. Moreover, Defendant Blair assured investors that the Company was working with large pharmaceutical customers to destock their inventory levels, stating, in relevant part:

> So let's start with orders. In the first half of the year, our orders were essentially down 20%. And as we look forward here to the second half of the year, we think that our orders will be down modestly. That's a combination of various factors. One being that our large customers, CDMOs, continue to work through inventories. . . . ***And, then, we are actively managing inventories down. While that is not new, we've intensified our efforts there really in order to get as much as possible of the stocking topic behind us here in 2023***.

163. Also during the 2Q23 Earnings Call, Defendant McGrew similarly provided assurance in response to a question asking him to quantify the amount of destocking, stating:

> I mean, I could probably come up with some numbers, but it would be imprecise. . . . ***I mean we don't really spend a lot of time trying to figure out how much was destocking as much as spending time with the customers in a pretty proactive way these days to understand what's on hand, what's the real need that you've got site by site by site so that we can help them manage down to an inventory level they are comfortable with***. . . . So I don't know that I've got a great answer for a number, ***but we are actively managing it in probably a way that was more active than we have been***.

164. Furthermore, on the 2Q23 Earnings Call, Defendant Blair informed investors that the pressures on the bioprocessing business would bottom out in 2023, stating:

> We talked about the various puts and takes of the destocking that I think you correctly summarized with pharma and emerging biotech. You see the China piece that we're flagging here. And, then, of course, actively managing those inventories

> with our customers here in order to get as much as possible behind us in 2023. ***And we think 2023 probably is the bottom***.

165. The statements detailed above were materially false and misleading when made because they failed to disclose materially adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) revenues from the Company's COVID-19 related products would materially decline as customers pursued other priorities as the COVID-19 pandemic ended and the COVID-19 virus entered its endemic phase; (ii) customers had stockpiled inventory in the aftermath of the COVID-19 pandemic and were relying on those items to satisfy their needs instead of placing new orders with the Company; (iii) smaller, early-stage biotechnology customers no longer had the same access to external funding to purchase the Company's products; (iv) revenues from the Company's products and services unassociated with COVID-19 were insufficient to compensate for the foregoing downturn in business; (v) accordingly, Danaher would be unable to sustain its pandemic-era growth in 2022 and 2023; (vi) the Company failed to maintain adequate internal controls; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***The Truth Emerges***

166. The truth emerged gradually throughout the Relevant Period through a series of partial disclosures. On May 11, 2022, following the 1Q22 Earnings Call, Defendant Blair revealed for the first time that annual revenue in Danaher's bioprocessing business for products and services supporting the production of COVID-19 vaccines and therapeutics was expected to be $1.4 billion to $1.5 billion in 2022, down from previous estimates of $2 billion. Specifically, Defendant Blair stated: "And the way we make that happen is that ***the far larger parts of the non-COVID***

***therapeutic and vaccine business is growing at mid-teens plus, and that is really what's driving the overall guide of high single digits, low double digits for 2022***." Nonetheless, despite this partial correction, the Individual Defendants continued to mislead investors by assuring that the miss would be made up for by growth in the non-COVID arm of the bioprocessing business and the Company would still deliver high single digit to low double digit growth for bioprocessing as a whole.

167. On July 21, 2022, Defendant Blair admitted that Danaher expected the bioprocessing business to earn only $1 billion for COVID-related vaccines and therapeutics in 2022, but continued to mislead investors by emphasizing that "***there's no change to our high single to low double-digit core revenue growth outlook in our bioprocessing business*** for the year [2022] as customers are accelerating their investments across all other major therapeutic modalities." However, after this partial correction, the Individual Defendants continued to mislead investors.

168. [redacted]

169. On October 20, 2022, before market open, Defendant Blair advised investors that the Company expected the bioprocessing business to only generate $800 million in COVID-related sales 2022, and deliver high single digit growth for 2022, down from the high single digit to low double digit growth previously communicated. Analysts that follow the Company took immediate

notice. One analyst from Bank of America stated "you're talking about high single-digit growth for the full year" but "you commented high single to double-digit [the] prior quarter." Yet, the Individual Defendants continued to mislead investors by reiterating the previous forecast that the Company expected its bioprocessing business to generate $500 million in COVID-related sales in 2023, and that the bioprocessing business as a whole would deliver high single digit growth in 2023. On this news, the Company's stock price fell $14.81, nearly 6%, to close at $243.08 per share on October 20, 2022.

170. On January 24, 2023, before market open, the Company announced that it expected core sales to *decline* by mid-single digits in 2023, as a result of "lower demand for COVID-19 testing, vaccines and therapeutics." The Company also announced that it only expected to grow base business core sales by high single digits in 2023. The Company continued to mislead investors, however, by downplaying the extent of the demand slump. On this news, the Company's stock price fell $14.05 over the following two trading days, approximately 5.2%, closing at $262.95 per share on January 25, 2023.

171. On April 25, 2023, before market open, Defendants Blair and McGrew admitted that there was a slowdown in the base bioprocessing business, and that the Company now expected its base business core sales to only grow by mid-single digits in 2023, down from high single digits. Specifically, Defendants Blair and McGrew stated that the slowdown in the base bioprocessing business stemmed from (i) continued destocking at its established large pharmaceutical customers that they first spoke about in the second half of 2022, and (ii) funding constraints among small biotech startups that began in the second half of 2022. Moreover, Defendant Blair conceded that the continued deterioration in the non-COVID ordering book for bioprocessing was attributable to destocking phenomenon at large pharmaceutical customers. Still,

Individual Defendants would continue to mislead and downplay the extend of the demand slump the Company faced. On this news, Danaher's stock price fell $22.36, approximately 8.8%, to close at $231.99 per share on April 25, 2023.

172. On July 25, 2023, the Company again revised its annual outlook, cutting base business core sales growth from mid-single digits to low-single digits, resulting in a core sales decline of high single digits to low double-digits, up from a decline of high-single digits. Defendant Blair revealed that the cut to Danaher's base business core sales guidance was attributable to "near-term challenges within bioprocessing," including, in particular, "the funding environment and the stocking situation in China." Defendant Blair further admitted that the Company needed "a more frequent touch point pattern . . . with our customers in order to ensure that we keep our finger on the pulse of what's going on there." On this news, Danaher's stock price fell $2.90, approximately 1.1%, to close at $255.69 per share on July 25, 2023.

173. On October 24, 2023, the truth fully emerged when the Company revealed that it had cut its full year outlook yet again, increasing the core sales decline to a firm low double digit range and inverting modest growth in the base business to a low single digit decline. Defendant Blair confirmed that "customers are still working through inventory built up during the pandemic[.]" Defendant Blair later added: "And bioprocessing was as expected, and we don't believe that changes here either. So, we do believe that we're at the bottom here in 2023 in bioprocessing." On this news, Danaher's stock price fell $11.40, or approximately 5.6%, over the following two days to close at $192.65 per share on October 25, 2023.

174. One week after the truth fully emerged, Defendant Ligner announced on LinkedIn that he was stepping down from his role as the Executive Vice President of the Biotechnology reporting Segment.

***Harm to the Company***

175. As a direct and proximate result of the Individual Defendants' misconduct, Danaher has lost and expended, and will lose and expend, millions of dollars.

176. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and Defendants Blair, McGrew, and Ligner, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

177. Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

178. Such losses also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

179. As a direct and proximate result of the Individual Defendants' conduct, Danaher has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

***Individual Defendants' Knowledge***

180. Moreover, throughout the Relevant Period, the Individual Defendants were aware of the diminishing demand of the Company's products, the biotechnology funding headwinds in China, and inventory stockpiling concerns. [redacted]

[redacted]

181. [redacted]

182. [redacted]

183. [redacted]

[redacted]

184. [redacted]

185. [redacted]

[redacted]

186. [redacted]

187. [redacted]

188. [redacted]

189. [redacted]

190. [redacted]

191. [redacted]

192. [redacted]

193. [redacted]

[redacted]

194. [redacted]

195. [redacted]

***Former Employee Statements***

196. This action is based in part on Plaintiff's review, by counsel, of non-public and public documents as well as the Amended Complaint (the "AC") in the Securities Class Action (ECF No. 24), which contains allegations based on interviews with four former Danaher employees (referred to herein as "FE1–4") who provided information to plaintiffs' counsel in the Securities Class Action supporting the allegations in that case. These former employees provided information on a confidential basis and were described in the AC with sufficient detail to establish their reliability and personal knowledge.

197. FE1 worked for Danaher from March 2021 to July 2023, first as Manager of Internal Communications, and later as Global Senior Manager of Internal Communications. In these roles, FE1 supported internal communications for various Danaher groups, including for senior executive. FE1 reported to FE4. Among other responsibilities, FE1 had direct contact with Defendant Blair and helped prepare him for town halls each quarter with the corporate staff. FE1 also reviewed operating results and financial metrics with Blair in advance of the town hall.

198. FE2 worked for Danaher from September 2014 to February 2022 as a Global Financial Analyst within the Environmental & Applied Solutions segment. FE2 was responsible for month-end financial close and monthly forecasting along with budgeting at the water quality division. FE2 reported to Vice President and CFOR for Water Platform High Growth Markets, Andrew Pope, and then North American Controller for the water quality division, Patrick Miller, who both reported to Christophe Pattyn ("Pattyn"). Pattyn reported directly to the Company's senior executives.

199. FE3 worked for Danaher from 2019 to November 2022 as Head of Financial Planning & Analysis and Controller of Sea-Bird Scientific. FE3 was responsible for preparing financial statements and financial forecasts at Sea-Bird Scientific and reported to Pattyn.

200. FE4 worked from December 2018 to March 2023 and was the Company's Senior Director of Internal Communications from January 2021 to March 2023. FE4 led the internal communications team and supported enterprise-wide employee communications. FE4 also supported C-suite executives on internal messaging and communications. FE4 reported to then-Vice President of Communications, Meghan Britt, who reported to the Company's Chief Human Resource Officer, Georgann Couchara, who reported directly to Blair.

201. These former employees identified that Danaher's management were deeply attuned with forecasts of all of the Company's subsidiaries, and even played a hand in choosing which figures to highlight and which to downplay or possibly exclude.

202. For example, FE1 explained that there was a standard practice for preparing financial statements and financial forecasts at the Company. AC ¶ 61. According to FE1, financial results and projections were prepared at the subsidiary level, and the practice at Danaher was for each subsidiary to send this financial information to the division head who would compile the data of all operating companies in the division and pass it along in a consolidated basis to senior Danaher executives. *Id.* FE1 indicated that Defendant Blair in particular would learn about the status of sales and revenue projections from each division from Defendant McGrew. *Id.* However, FE1 emphasized that Danaher corporate "had the final say" in the rollup, which often upset executives at the operating companies when the figures changed. *Id.*

203. FE2's recollections support FE1's statements. FE2 also stated that financial forecasts were prepared by each subsidiary, consolidated at the division level, then sent to corporate to roll up for Danaher as a whole. AC ¶ 62. FE2 further explained that each operating company at Danaher was require to prepare such projections, referred to by Danaher as the "Forecast," once every month. *Id.* According to FE2, each iteration of the Forecast during a fiscal

year was assigned a sequential number, e.g., "FC1, FC2, etc." *Id.* These Forecasts included projections for items such as "sales" and "gross margins," said FE2. *Id.* As FE2 advised, all operating companies at Danaher were required to use a tool called OneStream to consolidate financial forecasts, and the President and CFO of each division would review each Forecast before submitting them to Danaher corporate. *Id.* FE2 also confirmed that senior executives in Danaher corporate convened a meeting each month to review the Forecasts they received. *Id.* Like FE1, FE2 observed that these senior leaders made any final changes. *Id.*

204. Similarly, FE3 explained that there were regular, monthly meetings at Danaher operating company Sea-Bird Scientific to go over period-to-date financial results attended by representatives from Danaher corporate. AC ¶ 63. FE3 added that Sea-Bird Scientific had its own set of financial statements but those were combined with the other operating companies in the water quality division in EAS and presented to Danaher corporate on a consolidated basis for the entire water quality division. *Id.*

205. Moreover, with the amount of money spent building Danaher's life sciences portfolio, Defendant Blair was under intense pressure to produce results, leading to Blair ignoring forecasts received from Danaher's operating companies and contriving new figures that looked better to the investment community. For example, FE4 sat on scheduled "president's call" on April 21, 2022, with approximately sixty presidents of Danaher subsidiaries and Defendant Blair. During the call, FE4 recalled that "Blair was yelling and saying he didn't like the projections the presidents of the subsidiaries had given him, so he and the investor relations team made up ones that looked better" for the second quarter of 2022 earnings call. FE4 was "shocked" by the admission and stated that Blair likely "had no idea someone like me was on the line." AC ¶ 64. FE4 further noted

that "[a] lot of people" at Danaher said Defendant Blair "was feeling at risk for his job if the stock price wasn't moving." *Id.*

***Insider Sales***

206. Rather than providing the market with correct information, Defendants Blair, Weidemanis, Raskas, McGrew, Honeycutt, Filler, Stevens, Lohr, and List (the "Insider Selling Defendants") used their knowledge of Danaher's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated. As officers and directors of Danaher, the Insider Selling Defendants were privy to material, nonpublic information about the Company's true business health. Notably, only one sale was made pursuant to a trading plan.

207. As a result of the below improper insider sales, the Insider Selling Defendants sold over $52.7 million worth of stock at artificially inflated prices

208. While in possession of material nonpublic information, defendant Weidemanis sold 80,889 shares of his personally held Danaher stock for proceeds of $21.6 million. His sales were timed to maximize profit from Danaher's then artificially inflated stock price. Defendant Weidemanis' sales are suspicious given that his stock sales represented 43.46% of his holdings.

209. While in possession of material nonpublic information, defendant Blair sold 25,000 shares of his personally held Danaher stock for proceeds of $7.5 million. His sales were timed to maximize profit from Danaher's then artificially inflated stock price. Notably, this stock sale was made in one day pursuant to a trading plan. However, the sale was after a confidential witness in the Securities Class Action "heard Blair admit to making up more favorable numbers for an April 2022 earnings call—a call which the shareholders allege involved extensive discussion about the bioprocessing division's anticipated performance." Order at 14-15. Defendant Blair's sales are suspicious given that his stock sales represented 16.02% of his holdings.

210. While in possession of material nonpublic information, defendant Raskas sold 31,060 shares of his personally held Danaher stock for proceeds of $7.4 million. His sales were timed to maximize profit from Danaher's then artificially inflated stock price. Defendant Raskas' sales are suspicious given that his stock sales represented 40.6% of his holdings.

211. While in possession of material nonpublic information, defendant McGrew sold 18,935 shares of his personally held Danaher stock for proceeds of $5.2 million. His sales were timed to maximize profit from Danaher's then artificially inflated stock price. Defendant McGrew's sales are suspicious given that his stock sales represented 23.95% of his holdings.

212. While in possession of material nonpublic information, defendant Honeycutt sold 11,988 shares of her personally held Danaher stock for proceeds of $3.2 million. Her sales were timed to maximize profit from Danaher's then artificially inflated stock price. Defendant Honeycutt's sales are suspicious given that her stock sales represented 28.78% of her holdings.

213. While in possession of material nonpublic information, defendant Filler sold 10,190 shares of her personally held Danaher stock for proceeds of $2.6 million. Her sales were timed to maximize profit from Danaher's then artificially inflated stock price. Defendant Filler's sales are suspicious given that her stock sales represented 25.36% of her holdings.

214. While in possession of material nonpublic information, defendant Stevens sold 8,410 shares of his personally held Danaher stock for proceeds of $2.2 million. His sales were timed to maximize profit from Danaher's then artificially inflated stock price. Defendant Stevens' sales are suspicious given that his stock sales represented 50.05% of his holdings.

215. While in possession of material nonpublic information, defendant Lohr sold 7,396 shares of his personally held Danaher stock for proceeds of $1.9 million. His sales were timed to maximize profit from Danaher's then artificially inflated stock price.

216. While in possession of material nonpublic information, defendant List sold 3,490 shares of her personally held Danaher stock for proceeds of $918,917. Her sales were timed to maximize profit from Danaher's then artificially inflated stock price. Defendant List's sales are suspicious given that her stock sales represented 16.63% of her holdings.

217. The Insider Selling Defendants' sales were timed to maximize profit from the Individual Defendants overall scheme to artificially inflate Danaher's stock price. While the Individual Defendants made materially false and misleading statements, the Company's stock price rose to as high as $302.35 per share on August 15, 2022. When the truth fully emerged, the Company's stock price fell to $192.65 on October 25, 2023. Notably, the Insider Selling Defendants' sales ranged from $228.50 to $300 per share. As a result of these insider sales, the Insider Selling Defendants were unjustly enriched.

***Share Repurchases***

218. According to the Company's public filings, while the price of the Company's stock was artificially inflated due to the false and misleading statements detailed above, the Individual Defendants caused the Company to repurchase approximately 3,906 shares of its own stock for a total of $1.06 million during the Relevant Period.

219. According to the Company's quarterly report filed on Form 10-Q with the SEC on October 20, 2022, Danaher made the following repurchase of its own stock during the Relevant Period:

| Dates of Stock Repurchase | Number of Shares Repurchased | Average Price Per Share on Date of Repurchase | Total Cost of Repurchase |
|---|---|---|---|
| July 2, 2022 to August 1, 2022 | 3,906 | $273.84 | $1,069,619.04 |

220. Given that the price of Danaher stock was $192.65 per share on October 25, 2023

after the corrective disclosures were made, the true value of the 3,906 repurchased shares was roughly $752,000. Accordingly, the Individual Defendants caused the Company to overpay approximately $317,000 to repurchase these shares during the Relevant Period.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

221. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

222. Danaher is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

223. Plaintiff is a current shareholder of Danaher and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

224. A pre-suit demand on the Board of Danaher is futile and, therefore, excused. At the time this action was commenced, the twelve-member Board consisted of Individual Defendants Blair, Dewan, Filler, List, Mitchell Rales, Steven Rales, Sanders, Schwieters, Spoon, Stevens, and Zerhouni (the "Director Defendants") and non-party Charles Lamanna (together with Director Defendants, the "Directors"). Accordingly, Plaintiff is only required to show that six Directors cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

225. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

226. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

227. Moreover, the Directors willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

228. Defendant Blair is not disinterested or independent and is therefore incapable of considering a demand. In addition to serving as a director, Blair serves as the Company's President and CEO. Thus, as conceded in the Company's proxy statement filed with the SEC on Schedule 14A on March 25, 2026 (the "2026 Proxy"), Defendant Blair is a non-independent director. Furthermore, Defendant Blair is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

229. Defendant Mitchell Rales is also not disinterested or independent and is therefore incapable of considering a demand. In addition to serving as a director, Mithcell Rales is a co-founder of the Company and was previously the Company's President from 1984 to 1990. Thus, as conceded in the 2026 Proxy, Defendant Mitchell Rales is a non-independent director.

230. Defendant Steven Rales is likewise not disinterested or independent and is therefore incapable of considering a demand. In addition to serving as a director, Steven Rales is a co-

founder of the Company and was previously the Company's CEO from 1984 to 1990. Thus, as conceded in the 2026 Proxy, Defendant Steven Rales is a non-independent director.

231. Director Defendants Blair, Filler, Stevens, and List are also Insider Selling Defendants and used their knowledge of Danaher's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated. As officers and directors of Danaher, the Insider Selling Defendants were privy to material, nonpublic information about the Company's true business health. Blair sold 25,000 shares of his personally held Danaher stock for proceeds of $7.5 million. Notably, this stock sale was made in one day pursuant to a trading plan. However, the sale was after a confidential witness in the Securities Class Action "heard Blair admit to making up more favorable numbers for an April 2022 earnings call—a call which the shareholders allege involved extensive discussion about the bioprocessing division's anticipated performance." Order at 14-15. Defendant Blair's sales are suspicious given that his stock sales represented 16.02% of his holdings. Filler sold 10,190 shares of her personally held Danaher stock for proceeds of $2.6 million. Defendant Filler's sales are suspicious given that her stock sales represented 25.36% of her holdings. Stevens sold 8,410 shares of his personally held Danaher stock for proceeds of $2.2 million. Defendant Stevens' sales are suspicious given that his stock sales represented 50.05% of his holdings. Defendant List sold 3,490 shares of her personally held Danaher stock for proceeds of $918,917. Defendant List's sales are suspicious given that her stock sales represented 16.63% of her holdings. Accordingly, demand is futile as to Blair, Filler, Stevens, and List.

232. Defendants List, Sanders, Schwieters, and Stevens (the "Audit Defendants") serve on the Company's Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight

responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations as alleged above. This is supported by the Section 220 documents as described herein. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

233. The Section 220 documents demonstrate, leading up to and throughout the Relevant Period, the Individual Defendants were aware of, and discussed, the declining revenues of the Company's COVID-related business, the Company's customer's stockpiled inventory, the reduction in COVID funding, and the diminished revenue from the Company's non-COVID-related business.

234. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

235. All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded

the Board's current members from calling into question the Director Defendants' conduct.

236. Moreover, none of the Directors have taken remedial action to redress the conduct alleged herein.

237. The Directors' conduct described herein and summarized above could not have been the product of legitimate business judgement as it was based on bad faith and intentional reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation form their violations of duty pursuant to the Company's charter. As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent disinterested judgement about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

238. Furthermore, Individual Defendants Blair, Spoon, McGrew, Stevens, and List received material personal benefits from their insider sales as a result of the Individual Defendants' false and misleading statements alleged herein.

239. The acts complained of herein constitute violations of fiduciary duties owed by Danaher's officers and directors, and these acts are incapable of ratification.

240. Thus, for all of the reasons set forth above, the Directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

### Against the Individual Defendants for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R. § 240.14a-9)

241. Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

242. The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

243. Section 14(a) of the Exchange Act provides that:

> It shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 781].

15 U.S.C. § 78n(a).

244. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

245. The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2022 Proxy and 2023 Proxy, which were filed with the SEC. As alleged above, the 2022 Proxy and 2023 Proxy were materially false and misleading because they failed to disclose, *inter alia*, that the Board and management were not properly overseeing risks to the Company, namely risks related to dissemination of statements on the continued demand for products supporting the development of treatments for COVID-19 and on the Company's bioprocessing business.

246. The misrepresentations and omissions in the 2022 Proxy were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company

stockholders in voting on matters set forth for shareholder determination in the 2022 Proxy, including, but not limited to, the reelection of certain of the Defendants to the Board. Specifically, the materially false and misleading statements contained in the 2022 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Blair, Filler, List, Lohr, Mega, Mitchell Rales, Steven Rales, Sabeti, Sanders, Schwieters, Spoon, Stevens, and Zerhouni to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

247. The misrepresentations and omissions in the 2023 Proxy were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2023 Proxy, including, but not limited to, the reelection of certain of the Defendants to the Board. Specifically, the materially false and misleading statements contained in the 2023 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Blair, Dewan, Filler, List, Lohr, Mega, Mitchell Rales, Steven Rales, Sabeti, Sanders, Schwieters, Spoon, Stevens, and Zerhouni to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

248. As a result of the Individual Defendants' material misrepresentations and omissions in the 2022 Proxy and 2023 Proxy, the Company has sustained significant damages.

249. Plaintiff, on behalf of Danaher, has no adequate remedy at law.

## COUNT II

### Against Defendants Blair, McGrew, and Ligner for Contribution Under Sections 10(b) and 21D of the Exchange Act

250. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

251. Danaher and defendants Blair, McGrew, and Ligner are named as defendants in the

Securities Class Action, which asserts claims under the federal securities laws for violations of sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to defendants Blair, McGrew, and Ligner's willful and reckless violations of their obligations as officers and directors of the Company.

252. Defendants Blair, McGrew, and Ligner, because of their positions of control and authority as officers and directors of the Company, were able to and did, directly or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

253. Accordingly, defendants Blair, McGrew, and Ligner are liable under 15 U.S.C. §78j(b), which creates a private right of action for contribution, and section 21D of the Exchange Act, 15 U.S.C. §78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

254. As such, Danaher is entitled to receive all appropriate contribution or indemnification from defendants Blair, McGrew, and Ligner.

255. Plaintiff, on behalf of Danaher, has no adequate remedy at law.

## COUNT III

### Against The Individual Defendants For Violations of Section 10(b) of the Exchange Act (15 U.S.C. § 78(j)) and Rule 10b-5 (17 C.F.R. § 240.10b-5)

256. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

257. The Individual Defendants participated in a scheme with the purpose and effect of defrauding Danaher. Not only is Danaher defending claims that it violated Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Danaher by the Individual Defendants.

258. During the Relevant Period, while the price of the Company's stock was artificially inflated as a result of the false and misleading statements issued, the Individual Defendants caused the Company to overpay by over $317,000 to repurchase approximately 3,906 shares of Danaher common stock.

259. The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

260. The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Danaher not misleading.

261. The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Danaher.

262. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

263. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have caused the Company to expend over approximately $1.06 million in the repurchase of Danaher stock at artificially inflated prices and have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

264. By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

265. Plaintiff, on behalf of Danaher, has no adequate remedy at law.

## COUNT IV

**Against the Individual Defendants**
**For Breach of Fiduciary Duty**

266. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

267. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, candor, loyalty, and due care.

268. Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

269. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their

fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

270. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) revenues from the Company's COVID-19 related products would materially decline as customers pursued other priorities as the COVID-19 pandemic ended and the COVID-19 virus entered its endemic phase; (ii) customers had stockpiled inventory in the aftermath of the COVID-19 pandemic and were relying on those items to satisfy their needs instead of placing new orders with the Company; (iii) smaller, early-stage biotechnology customers no longer had the same access to external funding to purchase the Company's products; (iv) revenues from the Company's products and services unassociated with COVID-19 were insufficient to compensate for the foregoing downturn in business; (v) accordingly, Danaher would be unable to sustain its pandemic-era growth in 2022 and 2023; (vi) the Company failed to maintain adequate internal controls; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

271. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained,

or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

272. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

273. Moreover, in further breach of fiduciary duties during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase its own common stock at artificially inflated prices before the fraud was exposed.

274. The Insider Selling Defendants breached their duty of loyalty by selling Danaher stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders. The information described above was material, nonpublic information concerning the Company's future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Danaher common stock.

275. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

276. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide

damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

277. Plaintiff, on behalf of Danaher, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Unjust Enrichment

278. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

279. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Danaher.

280. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Danaher that was tied to the performance or artificially inflated valuation of Danaher or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

281. Plaintiff, as a shareholder and a representative of Danaher, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants, including gains from illegal insider sales, due to their wrongful conduct and breach of their fiduciary and contractual duties.

282. Plaintiff, on behalf of Danaher, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein,

together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Directing Danaher to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Danaher and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;
- strengthening the Company's internal reporting and financial disclosure controls;
- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and
- strengthening the Board's internal operational control functions;

C. Awarding punitive damages;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: May 7, 2026

**LEVI & KORSINSKY, LLP**

By: *_/s/ Donald J. Enright_*

Donald J. Enright
1101 Vermont Ave., NW Suite 800
Washington, D.C. 20005
Telephone: (202) 524-4290
Email: denright@zlk.com

*Local Counsel for Plaintiff*

**RIGRODSKY LAW, P.A.**
Vincent A. Licata
Leah B. Wihtelin
225 Broadway, Suite 3707
New York, NY 10007
Telephone: (212) 201-7690
Email: vl@rl-legal.com
Email: lw@rl-legal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**GRABAR LAW OFFICE**
Joshua H. Grabar, Esq.
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085

**<u>VERIFICATION</u>**

I, Richard E. Koehler, have reviewed the allegations made in this Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Danaher Corporation common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: 5/2/2026

Signed by:
Richard Koehler
6CCFBA1A5EEB4DB...

RICHARD E. KOEHLER